## In the Matter of the Trusts Under the Will of Lotta M. Crabtree.[1]

Suffolk. January 2, 2007. - May 14, 2007.

Present: Marshall, C.J., Greaney, Spina, Cowin, & Cordy, JJ.

*Devise and Legacy,* Charitable trust. *Trust,* Charitable trust, Trustee's compensation, Removal of trustee. *Fraud. Fiduciary. Evidence,* Expert opinion. *Witness,* Expert.

A probate judge applied the appropriate standards in ordering the removal of professional trustees of several testamentary trusts [135-137], and two breaches of fiduciary duty found by the judge — namely, the trustees' misuse of one trust (both by using that trust account to pay trustees' fees for all of the trusts, and by using that account as an operating account for the other trusts) [137-140], and the trustees' unauthorized and undisclosed creation and maintenance of an endowment whose operation was not countenanced by the will that established the trusts [140-142] — were, alone or in combination, sufficient to justify removal of the trustees; further, the trustees failed to demonstrate any error in the judge's findings that the trustees had paid themselves excessive compensation [142-146]; however, while the trustees had committed serious breaches of their fiduciary duty, neither the conduct of the trustees singled out by the judge nor their conduct in any other respect constituted either "fraud on the court" or fraud as contemplated by G. L. c. 206, § 24 [148-150], and the judge's decision to surcharge the trustees personally for certain administrative expenses was not warranted in the circumstances [150-151].

In proceedings in Probate and Family Court concerning the administration of several trusts, the judge acted well within his discretion in determining that a witness was not qualified to testify as an expert on the reasonableness of the trustees' fees. [151-152]

This court declined to address an issue raised for the first time on appeal. [152-153]

Petitions filed in the Suffolk Division of the Probate and Family Court Department on April 19, 2001.

Following review by this court, 440 Mass. 177 (2003), further proceedings were had before *Jeremy A. Stahlin,* J.

---

[1]Lotta Agricultural Fund (agricultural fund trust), Lotta Fund for Aiding Discharged Convicts, Lotta Dumb Animal Fund, Lotta Educational Fund, Lotta Hospital Fund, Lotta Theatrical Fund, Mary A. Crabtree Fund (collectively, Crabtree trusts).

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*J. Owen Todd* (*Julie E. Green* with him) for the trustees.

*James R. DeGiacomo* (*Judith K. Wyman* with him), guardian ad litem.

MARSHALL, C.J. Issues surrounding the administration of seven trusts created under the will of Lotta M. Crabtree are before us once again,[2] this time on appeal from judgments of the Probate and Family Court removing the appellants Francis J. Harney and Robert G. Naughton as trustees, and surcharging them for excessive fees and administrative expenses charged to the Crabtree trusts in connection with the fifth accounts (for calendar year 1999) and the sixth and final accounts (for the period January 1, 2000, through July 5, 2000) of the trusts.[3] In addition to the orders of removal and surcharge, the judge held that the trustees' failure to disclose in their accounts that portions of their fees for all seven trusts were being paid from the account of a single trust constituted a "fraud on the Court."

In an unpublished memorandum and order pursuant to its rule 1:28, the Appeals Court affirmed the removal of the trustees and the reduction in their fees. *Matter of the Trusts Under the Will of Crabtree*, 66 Mass. App. Ct. 1102 (2006). It also ruled that the probate judge had abused his discretion by excluding certain testimony of an expert witness, and it vacated the surcharge for administrative expenses. On the trustees' petition for rehearing on the issue of fraud on the court, the Appeals Court issued an amended memorandum and order declining to reach the issue.[4] We granted the respective applications for further appellate review of the trustees and the guardian ad litem (GAL) previously appointed by the probate judge. See note 8, *infra*.

---

[2]See *Matter of the Trusts Under the Will of Crabtree*, 440 Mass. 177 (2003) (*Crabtree I*).

[3]The third trustee, Joseph F. Lyons, died on July 5, 2000.

[4]The Appeals Court concluded that the record was insufficient to permit it to pass on the judge's finding that the trustees had committed a fraud on the court, and that, in any event, "the issue was not litigated below and thus did not form any part of our decision."

We affirm in part and reverse in part. We affirm the removal of the trustees, and the surcharge for excessive fees paid to the trustees. We conclude that there was no error in the judge's actions concerning the expert witness's testimony, but that the judge erred in surcharging the trustees for administrative expenses that had been paid separately by the trusts. We reverse the judge's finding that the trustees committed a "fraud on the Court."

1. *Contested accounts.* We begin by recounting the legal controversy from which this dispute arose, and we then summarize the operative facts. Naughton, Harney, and Joseph F. Lyons were appointed successor trustees of each of the seven Crabtree trusts in 1984, 1992, and 1995, respectively.[5] Each trustee was a practicing attorney for the duration of his appointment, and the judge found that all three were acting as professional trustees, a status that carries with it a higher standard of conduct than that expected of ordinary trustees. See *New England Trust Co.* v. *Paine,* 317 Mass. 542, 550 (1945).

On May 25, 2000, the trustees filed the fifth accounts (the seventy-first accounts overall) of the Crabtree trusts, for the calendar year 1999. On November 29, 2000, Harney and Naughton filed the sixth and final accounts (the seventy-second accounts overall) of the Crabtree trusts for the period January 1, 2000, through July 5, 2000 (the date of Lyons's death). On May 17, 2001, the judge ordered the trustees to file a detailed written statement specifying the time the trustees spent on the trusts, as well as their basis for calculating trustee compensation and expenses.[6] The same day, the judge appointed the GAL to

[5]Although the Crabtree will provided for the appointment of the three initial trustees, it contained no provision concerning the appointment process for successor trustees. Since the creation of the Crabtree trusts, it has been the practice that, on the resignation or death of a trustee, the trustees nominate successor trustees. This practice was followed in the case of Robert G. Naughton, Francis J. Harney, and Joseph F. Lyons.

[6]The order required that the trustees file a written statement to include (a) a dated, itemized record of all time spent for which compensation was paid; (b) a dated itemization of all expenses for which reimbursement was paid; (c) the total payment made to the fiduciary; and (d) a certification that the services listed were provided and that the services and time spent were necessary and were within the scope of services that the fiduciary was appointed to perform. See *Crabtree I, supra* at 181.

represent the interests of the potential student charitable bene-
ficiaries of the largest trust, the Lotta Agricultural Fund
(agricultural fund trust), as to the seventy-first and seventy-second
Accounts, and to review those accounts.[7,8] On December 13,
2001, the trustees filed identical affidavits in response to the
judge's order, outlining the time they claimed to have spent on
trust business and the formulae they used to determine fees and
expenses. The affidavits were submitted "under protest and
reserving all rights of appeal."

The GAL filed his report with the Probate and Family Court
on April 9, 2002. He concluded that the trustees had charged
fees and expenses to the trusts that were "clearly excessive,"
and that the trustees had impermissibly established an endow-
ment fund at the University of Massachusetts (university) using
income from the agricultural fund trust. He recommended that
the fifth and sixth accounts be disallowed.[9] The GAL further
recommended that the trustees be required to restate the ac-
counts, and that they be surcharged for "any excessive fees and
expenses" they had charged to the trusts. On June 19, 2002, the
judge ordered a hearing on the fifth account of the agricultural
fund trust, and the sixth account of all seven trusts, to be fol-
lowed by a trial. The hearing and trial were held on fourteen
nonconsecutive days between January 7 and September 30,

---

[7]The order stated that "the guardian ad litem's review of the [agricultural
fund trust] and account shall include, but not be limited to:

"a. Trustee compensation,

"b. Whether all income is being used in accordance with the require-
ments of paragraph 10(a) of the will,

"c. Whether distributions recorded in the accounts as 'Distributions
University of Massachusetts' are in accordance with the requirements of
paragraph (10)(a) of the will,

"d. Whether investments have been made consistent with the provi-
sions of paragraph (13) of the will."

[8]The trustees unsuccessfully appealed from this order. See *Crabtree I*,
*supra*. We affirmed the judge's order concerning the requirement to file
reports and the appointment of a guardian ad litem (GAL). *Id.* at 188-194.

[9]On November 17, 2000, the judge allowed all of the accounts filed under
the fifth account except for the account of the agricultural fund trust.

2003. During the course of the trial, the judge heard testimony from, among others, an expert witness for the GAL, Stephen Howe,[10] and an expert witness for the trustees, Michael Puzo.[11] James Pitts, the senior vice-president for finance and administration of The Boston Foundation, an expert witness for the trustees, was not permitted to testify on the issue of the reasonableness of the trustees' fees, although the judge did permit Pitts to testify as an expert on other matters.

On July 29, 2004, the judge ordered removal of the trustees. The judge required Naughton and Harney to repay $122,960.22, together with interest, to the agricultural fund trust in relation to its fifth account (for 1999), and a total of $69,737.69, together with interest, to all seven Crabtree trusts in relation to their sixth and final accounts (for 2000).[12] The judge also appointed successor trustees.

We turn now to the judge's factual findings, supplementing them where appropriate with uncontested material from the record.

2. *Factual background.* a. *The will.* On September 25, 1924, Crabtree, a well-known vaudeville star and stage actress, died. In her will, dated October 5, 1922, she created eight testamentary charitable trusts. Seven are currently active.[13] Each of the Crabtree trusts is a separate entity with a distinct charitable purpose, requiring separate administration and the filing of separate probate accounts. The stated purpose of the largest trust, the agricultural fund trust, is to provide loans to graduates of what

[10]Stephen Howe, a professional trustee, testified on the calculation of the trustees' fees, the investment choices of the trustees, and the accounting practices applicable to the trusts, among other subjects.

[11]Michael Puzo, a professional trustee, testified on the reasonableness of the trustees' fees, the management of the trusts, the duties of these particular trustees, and the propriety of charging the trusts separately for administrative expenses, among other subjects.

[12]Although only Harney and Naughton were found jointly and severally liable, the amounts included the share of the excessive fees paid to (and expenses that would have been owed by) the deceased third trustee, Lyons.

[13]See note 1, *supra.* The eighth trust was created for the benefit of "wounded and sick soldiers, sailors and women who were actually in the service of the United States during [the First] World War." This trust expired, by terms of will, forty years after its creation; the balance of its funds were then distributed among the remaining seven trusts.

is now the University of Massachusetts, as well as financial assistance to needy and meritorious students for their studies at the university.[14] As of December 31, 1999, the assets of the agricultural fund trust had a market value of $4,082,766.05. The other six trusts have fewer assets, with market values as of December 31, 1999, ranging between $159,120.02 and $1,050,052.34. The combined market value of the other six trusts as of December 31, 1999, was $3,806,730.26.

b. *Operation of the Crabtree trusts.* The judge made detailed findings concerning the operation of the seven trusts. Although the trustees argue otherwise, the judge found that the administration of the Crabtree trusts, particularly the smaller trusts, was not particularly onerous.[15] Having available to him records including minutes of trustee meetings and lawyers' diaries, the judge found that the trustees met weekly for less than one and one-half hours, on average, to discuss grant making and other trust matters, and that they rarely engaged in trust activities at other times.

---

[14]According to the terms of the will, the trustees are directed to loan "from the semi-annual income of [the] fund, without interest, to such graduates of the Massachusetts Agricultural College, in Amherst, Massachusetts, as have completed their course at said college and have received diplomas therefrom, and who desire to follow agricultural pursuits but are without means to enter upon the same, sums of money, such loans to be on such terms and conditions as in the judgment of my said trustees seem to be reasonable and proper, the re-payment of said loans to be reinvested by my said trustees for this same purpose." Should an insufficient number of agricultural applicants apply to the agricultural trust, the trust authorizes the trustees "to use [agricultural fund] income, semi-annually, as has not been employed in the manner and way hereinbefore described[,] to assist needy and meritorious students in completing their courses of study in said Massachusetts Agricultural College."

In a 1971 order, a probate judge authorized the trustees to make loans or grants to any needy students at the University of Massachusetts (university), regardless whether they are studying agricultural subjects. This order also authorizes the trustees to "seek the assistance of those officers of the University whose duties include administration of financial aid in any form" in determining which students should receive assistance from the agricultural fund.

[15]The agricultural fund trust averaged four loans each year during the twenty-five years ending in 2000. Loan recipients were identified by outside consultants, and loan documents were prepared by outside counsel, both paid by the potential borrowers. Also during the relevant periods, many of the beneficiaries of the Lotta Dumb Animal Fund and the Mary A. Crabtree Trust remained the same, year after year.

In addition to making loans to farmers,[16] the judge found that the trustees had distributed income of the agricultural fund trust to the Lotta M. Crabtree Endowment Fund (endowment). The endowment was established by the trustees in 1987 at the suggestion of officials at the university. Under the arrangement, rather than making direct grants or loans from trust income to eligible students, income from the agricultural fund trust was disbursed to the University of Massachusetts Foundation, Inc., which administers the endowment.[17] The endowment, in turn, used some, but not all, of the funds to make scholarship grants to undergraduate and graduate students at the university. From 1987 until 1999, the trustees paid $631,751 of income from the agricultural fund trust into the endowment, and as of 2003, only $301,500 had been paid out.[18] The trustees also agreed that ten per cent of the annual income of the endowment itself would be added to the endowment principal.

c. *General accounting, fees, and expenses.* Trustees' fees formed the bulk of trust expenditures. Both Naughton and Harney submitted affidavits averring that they did not keep itemized records of the time they spent on trust business, and that their compensation was not based on the time spent, "but rather on the basis customary to Boston trustees, i.e., law firms and banks managing trust assets, a percentage of principal under management and of income periodically." Under the formula adopted by the trustees, each trustee was paid a flat fee of "$3,500 per month which in total is approximately one-half of one percent of the principal assets, plus about $1,000.00 per quarter, which represents approximately one-third of [three]

---

[16]In relation to the receipt of loan payments, the judge also found that the trustees had continued the "confusing" procedure of their predecessors of maintaining separate investment accounts for the principal and the income, respectively, of the agricultural fund trust. Although the trustees had been ordered by a 1971 decree to treat loan repayments as income, they deposited the payments in the principal fund, and then purported to borrow cash from the principal fund to make payments and distributions from income, which were indicated on their accounts as funds due from the income fund to the principal fund.

[17]The University of Massachusetts Foundation, Inc., is a private foundation that manages the endowment funds for the university.

[18]The terms of the will required the trustees to distribute the income of the agricultural fund trust semiannually. See note 14, *supra*.

trustees' share of 6% of earned income." The percentage fee was paid on a quarterly basis. The trusts also generated administrative expenses, primarily for rent, accounting services, and a part-time secretary.[19]

The assets of the seven trusts were held in seven separate investment accounts at the brokerage firm Salomon Smith Barney, where each trust also had its own checking account. However, the trustees' practice was to pay the administrative expenses for all seven trusts, as well as the flat monthly portion of the trustees' fee, from the agricultural fund trust account alone.[20] At the end of the year, the six other trusts reimbursed the agricultural fund trust, without interest, for their respective share of administrative expenses incurred. The six trusts did not reimburse the agricultural fund trust for their respective portion of the flat monthly trustees' fee. The accounts of each respective trust indicated that the administrative expenses were paid on a pro rata basis by the separate trusts, with no indication in the accounts that the payments were actually reimbursements.[21]

Against this factual background, we consider the merits of this appeal. We turn first to the issue of removal.

3. *Removal of the trustees.* The law controlling trustees' actions is well developed. The trustee of a testamentary trust acts, in effect, as the instrumentality of the decedent to promote the well-being of the trust beneficiaries in a specific manner, dictated by the terms of the trust. Where the trustee is a professional trustee, as in this case, the fiduciary duty is higher than that imposed on a lay trustee. See, e.g., Restatement (Second) of Trusts § 174 (1959) ("if [a] trustee has or procures his appointment as trustee by representing that he has greater skill than that of a man of ordinary prudence, [that trustee] is under a

---

[19]In 1999, the total administrative expenses of the trusts were $33,348.84. For the period covered by the sixth and final accounts, administrative expenses totaled $24,415.69.

[20]The quarterly fee component of the trustees' fee — based on a percentage of fund income — was paid from each of the seven trusts.

[21]While the trustees' affidavits state that the quarterly fee component was "paid from all accounts," it is not clear from the record whether the quarterly fee was paid directly from each trust's account, or whether the quarterly fee was treated as an "expense[]" (i.e., paid initially from the agricultural fund trust account, and then reimbursed by the other trusts at the end of the year).

duty to exercise [that greater degree of] skill''); Restatement (Third) of Trusts § 77(3) (Council Draft No. 4 2004) (same). See also 2A A.W. Scott & W.F. Fratcher, Trusts § 174.1 (4th ed. 1987). This court has also held that ''[t]he law does not look with special favor upon attempts to impair the breadth and strength of the safeguards which experience has erected for the protection of those whose property has been confided to the good faith and sound judgment of trustees. And certainly this general attitude should not be softened first for the benefit of trust companies and professional trustees who hold themselves out as fully conversant with the duties of trustees and fully competent to perform them.'' *New England Trust Co.* v. *Paine*, 317 Mass. 542, 550 (1945).

''It is fundamental that a trust instrument must be construed to give effect to the intention of the donor as ascertained from the language of the whole instrument considered in the light of circumstances known to the donor at the time of its execution.'' *Watson* v. *Baker*, 444 Mass. 487, 491 (2005), quoting *Powers* v. *Wilkinson*, 399 Mass. 650, 653 (1987). Where trustees are shown to act in disregard of the settlor's intent, they breach their fiduciary duties in a manner that may justify their removal. See *Robinson* v. *Cogswell*, 192 Mass. 79, 87 (1906) (where trustees fail to perform their duties according to terms set forth by testator, beneficiary is entitled to have trustees removed so trust can be administered according to its terms). See also G. L. c. 203, § 12 (court authorized to remove trustee ''if it finds that such removal is for the interests of the beneficiaries of the trust or if he has become . . . incapable or is unsuitable therefor''). Dismissal of a trustee need not be predicated on the trustee's dishonest or selfish actions. *Scott* v. *Rand*, 118 Mass. 215, 218 (1875). Rather, the ''question in each case is whether the circumstances are such that allowing the trustee to continue would be detrimental to the trust.'' 2 A.W. Scott & M.L. Ascher, Trusts § 11.10, at 656 (5th ed. 2006). If challenged, a trustee has ''the burden of showing that he ha[s] discharged the duties of trustee with reasonable skill, prudence, and judgment.'' *Rugo* v. *Rugo*, 325 Mass. 612, 617 (1950). We review the decision of a judge to remove a trustee to determine whether the judge's findings are clearly erroneous, *Edinburg* v. *Cavers*, 22 Mass.

App. Ct. 212, 224 (1986), or whether there has been an abuse of discretion, *Chase* v. *Pevear*, 383 Mass. 350, 370 (1981), or other error of law.

In ordering removal of the trustees, the judge appropriately applied these standards. He listed eighteen separate breaches of fiduciary duty by the trustees, the bases for each of which are fully laid out in the judge's detailed factual findings, which we see no reason to dispute. The trustees counter that, even were we to accept the judge's findings, the documented infractions are, at most, minor and easily remediable, and do not justify removal. The severe sanction of removal, they argue, is reserved for cases such as those where a breach of duty evidences a palpable adversity to the interest of the beneficiaries or has improperly benefited the trustees. See, e.g., *Pinkowitz* v. *Edinburg*, 22 Mass. App. Ct. 180, 188-189 (1986). While some breaches of fiduciary duty found by the judge are less significant than others, we agree with the judge that together they document a history of, in the judge's words, the trustees' "basic lack of understanding" of their obligations as fiduciaries. Two of the breaches of fiduciary duty found by the judge, alone or in combination, are sufficient to justify removal: the breach of fiduciary duty inherent in the misuse of the agricultural fund trust (both by using the agricultural fund trust account to pay trustees' fees for all of the trusts, and by using that account as an operating account for the other trusts), and the breach of fiduciary duty inherent in the unauthorized and undisclosed creation and maintenance of an endowment, the operation of which was not countenanced by the will. We address each of these in turn.

a. *The use of the agricultural fund trust.* The trustees admit that neither the will nor any subsequent order modifying the terms of the agricultural fund trust authorized them to use the agricultural fund trust as an operating fund for all seven trusts. They claim that the practice was nevertheless appropriate and certainly not so egregious as to warrant removal. We disagree.

The trustees make three main claims in defense of their actions generally. First, they argue that they utilized this particular accounting method because it had been the practice of previous Crabtree trustees (and previous Crabtree accountants) to do so.

They also note that the Probate and Family Court and the Attorney General had approved previous accounts for the trusts in which the same accounting method was employed.

We recognize that a successor trustee is not strictly liable for the acts of a predecessor.[22] However, "the successor trustee has a positive duty, upon taking over the trust estate, to see that the predecessor has properly accounted for the whole of it." Loring, A Trustee's Handbook § 7.2.4, at 500 (C.E. Rounds ed. 2007). See G.G. Bogert, Trusts and Trustees § 583 (rev. 2d ed. 1980) ("If there is any default by the predecessor [trustee] in the performance of his duties . . . the successor trustee . . . should bring whatever actions are necessary against the predecessor . . . in order to repair the breach of trust by the predecessor"). Historical practice does not excuse a present failure of diligence. Nor can we say that the Attorney General had no objection to the trustees' method of accounting where the judge found that these impermissible accounting practices are not obvious from the accounts filed and not disclosed until the present litigation.

Second, relying on *Hutchinson* v. *King*, 339 Mass. 41, 44 (1959), the trustees claim that, because G. L. c. 206, § 2,[23] does not require any specific method of accounting, using the agricultural fund trust to pay trustees' fees for services rendered to the other trusts was not a breach of fiduciary duty. See *id.* at

---

[22]See, e.g., Restatement (Second) of Trusts § 223 (1959) ("trustee is not liable to the beneficiary for a breach of trust committed by a predecessor trustee" unless the trustee "[a] knows or should know of a situation constituting a breach of trust committed by his predecessor and he improperly permits it to continue; or [b] neglects to take proper steps to compel the predecessor to deliver the trust property to him; or [c] neglects to take proper steps to redress a breach of trust committed by the predecessor").

[23]General Laws c. 206, § 2, provides: "Accounts rendered to the probate court by an executor, administrator, trustee, guardian or conservator shall be for a period distinctly stated therein, and consist of three schedules, of which the first shall show the amount of personal property, and with respect to a trustee, guardian or conservator also the amount of the real property, according to the inventory, or, instead thereof, the amount of the balance of the next prior account, as the case may be, and all income and other property received and gains from the sale of any property or otherwise; the second shall show payments, charges, losses and distributions; the third shall show the investment of the balance of such account, if any, and changes of investment. A trustee shall state in his accounts the receipts of principal and income separately and also the payments and charges on account of such principal and income separately."

44 (statute "makes no specific requirements as to the form in which particular transactions shall be reported"). However, we emphasized that, in whatever form presented to the court, the statements of accounts must be "consistent with the facts . . . [and] with applicable substantive rules of law. *Id.* Here, they were neither. The use of the agricultural fund trust as an operating fund for all seven trusts was not "consistent with the facts," as this practice was not disclosed in the accounts.

Moreover, such unauthorized and undocumented cross-usage of funds contravenes "substantive rules of law." "It is ordinarily the duty of the trustee not to mingle property held upon one trust with property held upon another trust, whether the two trusts are created by separate settlors or by the same settlor." Restatement (Second) of Trusts § 179 comment c (1959). See Restatement (Third) of Trusts § 84 comment c (Council Draft No. 4 2004) (same). See *Lannin* v. *Buckley*, 256 Mass. 78, 82 (1926) ("It is the duty of trustees holding two distinct trust funds to segregate them. They cannot ordinarily be invested together and the net income prorated to the beneficiaries. It is only by keeping them separate that the losses and charges can be allocated properly"). Cf. *New England Trust Co.* v. *Triggs*, 334 Mass. 324, 334 (1956) ("There was no impropriety in depositing the funds, with other trust funds awaiting investment or distribution, in a single fiduciary account, where, as was the case here, the separate interests of the several fiduciary accounts were noted at all times both in the deposit and in the securities which fully secured all the funds"). The judge found that by using the agricultural fund trust as an operating account to pay the expenses for the other six trusts, they deprived the agricultural fund trust of substantial income available for its beneficiaries. The trustees' actions in this regard illustrate the reason for the commingling prohibition: to avoid the negative consequences for beneficiaries that resulted here.

Finally, the trustees claim that the error, if any, of paying monthly trustees' fees for all seven trusts from the agricultural fund trust alone was de minimis and easily correctable. The trustees note that the "practice" of paying their flat monthly fee from the agricultural fund trust arose because they spent the majority of their time in the administration of that trust. But if

at any point the trustees deemed the independent operation of the seven trusts impractical or impossible, they could have filed a complaint for instruction. See S.M. Dunphy, Probate Law and Practice § 29.6 (2d ed. 1997) (complaint for instructions not specific statutory remedy, but aspect of Probate and Family Court's general equity jurisdiction). What was not appropriate was for the trustees to alter the terms of the Crabtree will of their own accord and without disclosure to the court. As the judge rightly noted, the effect of the trustees' actions was to create an annual "gift of income" from the agricultural fund trust to the smaller funds that "add[ed] up to thousands of dollars each year that should have been going [under the agricultural fund trust] to the students," as Crabtree intended.[24] Such damage to the intended beneficiaries of the agricultural fund trust can hardly be deemed de minimis.

b. *The creation of a separate endowment.* Another basis for removal cited by the judge concerns the creation of a separate endowment at, and its subsequent administration by, the university. Without seeking prior court approval, the trustees created the endowment in 1987 using funds from the agricultural fund trust that were allocated for a farm loan that was not consummated. The endowment was then supplemented with additional contributions of income from the agricultural fund trust, in amounts ranging from a high of $157,751 in 1994 to no contribution in 2002. The trustees claim that both the will and the terms of a 1971 court order (1971 order) permit the establishment of the endowment. Alternatively, they argue that the language of the will and the 1971 order create enough ambiguity about the matter so that reasonable minds could differ. See, e.g., *Shirk* v. *Walker*, 298 Mass. 251, 259 (1937) (holding that "a few errors of judgment or of law as to matters about which honest and intelligent opinions might differ" do not constitute grounds for removal); *Edinburg* v. *Cavers*, 22 Mass. App. Ct. 212, 224 (1986) (same). Neither argument has merit.

---

[24]In 1999, the trustees' flat monthly fees totaled approximately $126,000. At that time the agricultural fund trust held approximately fifty per cent of the trust assets of all seven trusts. Accordingly, the agricultural fund trust paid approximately $63,000 in flat monthly fees that should have been paid (on a pro rata basis) by the other six trusts.

The will established the agricultural fund trust to provide loans, from trust income, to graduates of the Massachusetts Agricultural College in Amherst who wished "to follow agricultural pursuits." Any remaining income is to be distributed semiannually "to assist needy and meritorious students in completing their courses of study in said Massachusetts Agricultural College." See note 14, *supra*. The 1971 order, issued on a complaint for instruction brought by predecessor trustees, authorizes the trustees to offer grants or loans to any graduate student or undergraduate student at the university should there be an insufficient number of loan applicants. The 1971 order also authorizes the trustees to seek the assistance of university financial aid staff when making these grants and loans, and specifically directs that loan repayments be added to agricultural fund trust income for subsequent disbursement as a grant or loan.

We discern in neither the will nor any subsequent order any permission either to create an entirely new vehicle for dispensing the income of the agricultural fund trust or to assign management of that vehicle to a third party.[25] The trustees did not seek direction from the court for the creation of the endowment, or disclose in their accounts the existence of, balance in, or grants made from the endowment. The trustees were required by the terms of the will to distribute the income earned from the agricultural fund trust semiannually. By establishing the endowment, the trustees essentially converted trust income into a parallel pool of principal, only a small part of which was actually paid out to needy students. Whether or not this approach was "a good idea," as the trustees claim,[26] it was not countenanced under the Crabtree will. In the absence of a court

---

[25]Although trustees are authorized by the Massachusetts Prudent Investment Act, G. L. c. 203C, § 10, to "delegate investment and management functions if it is prudent to do so," here the trustees essentially abdicated control over the funds that comprised the endowment. For example, at least insofar as such documents are duplicated in the record, the "asset review" materials provided by the Foundation to the trustees consist only of broad summaries, not detailed data. Furthermore, both Harney and Naughton testified that once payments were made by the agricultural fund trust to the endowment, the trustees were not involved in the selection of the recipients except to provide formal approval.

[26]The trustees asserted that one reason they established the endowment was

order, it is the terms set out by Crabtree that must dictate the distribution of income from her estate. See *Watson* v. *Baker*, 444 Mass. 487, 495-496 (2005). Having concluded that the trustees breached their fiduciary duty as to the agricultural fund trust, such a finding justifies their removal as trustees from the other involved trusts. See *Quincy Trust Co.* v. *Taylor*, 317 Mass. 195, 196 (1944) ("Past maladministration of a comparable trust . . . warrants a finding [by the probate judge] that an executor or administrator is unsuitable"). See also G. L. c. 203, § 12.

c. *Excessive trustees' fees.* The judge concluded that the two breaches of fiduciary duty discussed above, "coupled with [the trustees'] payment to themselves of excessive compensation," warranted removal of the trustees. We therefore consider the trustees' challenge to the judge's finding that the fees charged were excessive. By statute, a trustee "shall be allowed his reasonable expenses, costs and counsel fees incurred in the execution of his trust, and shall have such compensation for services as the court may allow." G. L. c. 206, § 16. Additionally, G. L. c. 215, § 39, provides that "[p]robate [c]ourts may ascertain and determine the amount due any person for services as . . . trustees . . . ." Reasonable compensation for a trustee is determined by the specific facts of each case. *McMahon* v. *Krapf*, 323 Mass. 118, 123 (1948). What constitutes a reasonable fee is a "question of fact for the judge." *Id.* at 124.

The trustees calculated their own compensation by combining the flat monthly fee ($3,500 for each trustee) with a quarterly percentage fee (two per cent of the combined trusts' income for each trustee). In 1999, the fees taken from the agricultural fund trust were $138,498 ($126,000 of which comprised the monthly trustees' fees); and in the first half of 2000, $68,661 ($63,000 of which comprised the monthly trustees' fees). The total fees taken from the six other funds were $10,725 in 1999, and $5,061 in the first half of 2000, for a total compensation to all trustees of $149,223 for 1999 and $73,722 for the first half of 2000. As to the 1999 accounts, the judge limited his fee calculation to the

because the testator's intent — to provide predictable financial assistance to needy and meritorious students — was being rendered impracticable by the combination of her express instruction to distribute the income semiannually and the vagaries of the financial markets.

fee appropriate for services provided to the agricultural fund trust alone, because the fifth account of the agricultural fund trust was the only 1999 account before him.[27]

The trustees argue that the judge made numerous errors in calculating the fee, including: disregarding testimony of their expert witness Puzo as to the reasonableness of the fee; calculating the fee based on the presumption that the trusts were treated as a single management entity (rather than as seven separate accounts); calculating the grant-making portion of the fee by choosing an arbitrary rate of $100 an hour; underestimating the time spent by the trustees on grant-making activities; and ignoring the fact, they claim, that the 1999 fee charged to the agricultural fund trust, while appearing excessive on its face, was actually for services rendered to all seven trusts.

We see no such errors. The judge calculated the trustees' fee in two parts: the "fee schedule" fee and the "grant-making" fee. Turning first to the calculation of the "fee schedule" fee, the judge was well within his discretion to determine the extent to which he would credit the testimony of Puzo on the issue of the reasonableness of the trustees' fee. While the trustees argue that there was no other expert evidence regarding the reasonableness of the trustees' fees, the judge had ample evidence to guide him in this matter. Specifically, the fee schedules from eight other Boston-area trust management entities had been entered in evidence, several of which were attached to the trustees' own affidavits as supporting documentation.

The judge carefully examined the range of fees that other entities would have charged for all services (except tax preparation and grant making) for managing accounts similar in size to the accounts at issue here. He determined that the fees those entities would have charged to the fifth accounts of all the trusts would have ranged from a low of $39,849.89 to a high of $58,184.35. In contrast, the total fee actually charged by the trustees to the fifth accounts was $149,223. The judge's reliance on the fee schedules in evidence, and his determination of a fee in the amount of $41,000 — a figure that, while at the low end of the range, was not unreasonable — does not evidence an

---

[27]The fifth account of the other six trusts had been allowed previously by the court. See note 9, *supra.*

abuse of discretion.[28] See *McMahon* v. *Krapf, supra* (matter of reasonable compensation "rests to a large extent in the discretion of the judge").

The trustees next argue that by treating the seven trusts as one investment account for the purposes of calculating the fee, the judge committed the same error of which he found fault with the trustees.[29] We acknowledge that if each of the seven Crabtree accounts had been placed under separate trustee management, the combined fees charged would be substantially higher than the fees charged if the accounts were treated as a single investment account.[30] But the judge found that, in practice, the trustees did not separately manage the accounts as they should have. The trustees cannot now argue that despite their own improper treatment of the trust accounts, they are entitled to the larger fee that would have been owed to them had they managed the accounts properly.

After calculating the "fee schedule" fee, the judge turned to the "grant-making" fee, noting that "compensation for time spent on grant-making should be paid in addition to the compensation that results from [the] application of fee schedules." The judge calculated the grant-making fee by multiplying the time he determined the trustees spent on grant making by the hourly rate he determined was warranted. The trustees challenge the judge's finding as to both elements.

On the issue of time spent, the judge simply did not credit the assertion of the trustees that they spent "six to eight hours per week" on grant-making. A careful review of the minutes of the trustee meetings, lawyers' diaries, and other testamentary

---

[28]The judge then allocated this $41,000 fee pro rata among the trusts, and determined that the share owed to the trustees for the agricultural fund trust in 1999 — the only 1999 trust account before the court — amounted to $21,217.26. The judge engaged in a similar calculation for the sixth accounts covering the first half of 2000, determining that nonparty trustee entities would have charged between $18,125.39 and $28,548.28 to service these accounts, and that an appropriate fee for all the trusts would have been $19,000.

[29]The judge concluded that the trustees "have made it clear that they do not understand that there are seven separate and distinct trusts, each with separate purposes and funding."

[30]According to the trustees, the combined 1999 fee for managing the seven accounts separately would have ranged from $53,764 to $85,092, and for the first half of 2000, would have ranged from $25,011 to $41,861.

evidence, including lists of beneficiaries that remained substantially the same from year to year, revealed to the judge that the three trustees collectively spent approximately 263 hours on grant making in 1999, and less than one hundred hours in the first half of 2000. Trustees have the duty to "keep clear and accurate accounts, and the consequences of any failure to comply with this duty must fall upon [them]." *Rugo* v. *Rugo*, 325 Mass. 612, 617 (1950). This includes keeping clear and accurate records of time spent. The judge did not abuse his discretion by declining to credit the testimony of the trustees and relying instead on evidence in the record to determine the amount of time spent on trust activities.

As for the hourly rate for grant making, the judge ruled as follows: "Considering the expenditures made by the trustees that were not authorized by the trusts, and the purposes of some of the trusts for which no action was taken by the trustees, and considering that the legal work done reviewing loan documents resulted in improper and inaccurate identification of the lending trust, any hourly rate in excess of $100 per hour would be unreasonable and excessive." As we noted earlier, what constitutes a reasonable fee is a "question of fact for the judge." *McMahon* v. *Krapf, supra* at 124. While contrary to the judge's rulings, the trustees' expenditures from trust funds for certain administrative expenses were permissible, we see no reason to disturb the judge's discounted hourly rate, considering other documented failures of the trustees in conducting their grant-making activities, and the discretion that rests with the probate judge in making the determination. See *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.*, 414 Mass. 200, 210 n.6 (1993) (we may "affirm a judgment on grounds not specifically relied upon by the judge").

We comment briefly on the fee surcharge on the 1999 agricultural fund trust account. The trustees take issue with the judge's orders that they repay fees paid from the agricultural fund trust for services not related to that account, i.e., fees paid for services to the other six trusts. We conclude that the judge's imposition of the surcharge is sound. The agricultural fund trust was the only 1999 account before the judge, as the 1999 accounts of the six other trusts previously had been allowed in

November, 2000. See note 9, *supra*. While the surcharge may result in depriving the trustees of a portion of the fees that they believe the other trusts owe them, given that the previously allowed accounts all expressly included trustees' fees and those accounts had not been reopened and were not at issue in the trial proceedings, there was no error.

In light of our conclusion that the judge's decision to remove the trustees was sound, we need not consider whether the additional breaches of fiduciary duty found by the judge would constitute additional grounds for removal.[31] We nevertheless address one such holding challenged by the trustees. The judge concluded that the trustees had breached their fiduciary duties by disbursing principal from two trusts — the Dumb Animal Trust and the Discharged Convicts Trust — in violation of the terms of those trusts that interest only be distributed, and without prior court authorization. The trustees argue that they made payments from principal as authorized by a 1971 order of the Probate Court. The 1971 order is not a model of clarity; it requires, among other provisions, that as of January 1, 1970, the trustees of each of the Crabtree trusts are to "distribute each trust's income for each taxable year at such time and in such manner as not to subject it to tax under Section 4942 of the Internal Revenue Code of 1954, as amended."[32]

---

[31]The judge concluded that the trustees breached their fiduciary duties in numerous respects, including their failure to expend semiannually the income of some of the trusts as required by the Crabtree will, their failure to make bequests to specific entities named in the will, their failure to disclose in their accounts that they had subleased portions of the trust offices for personal use, and their failure to disclose in their accounts that they had hired the daughter of a trustee as a substitute secretary.

[32]Section 4942 of the Internal Revenue Code (I.R.C.) imposes a tax on any private foundation that fails to make sufficient annual distributions as specified in the I.R.C. Enacted as part of the Tax Reform Act of 1969, the rule was intended to prevent abuses by certain privately controlled charitable entities, *Hammond* v. *United States*, 764 F. 2d 88, 95 (2d Cir. 1985), and to encourage more income-producing investment, *Ann Jackson Family Found.* v. *Commissioner Internal Revenue Serv.*, 15 F.3d 917, 920 (9th Cir. 1994). We presume that the trustees sought the 1971 order in light of the then recently enacted Federal statute.

Briefly, under § 4942(a), a private foundation must distribute annually at least five per cent of the aggregate fair market value of the foundation's investment assets other than those that are used (or held for use) directly in

As the trustees were required by the terms of the Crabtree trusts to distribute all income to the designated beneficiaries, it is likely that the 1971 order was intended to authorize the distribution not only of "income" as provided in the order, but of any trust assets, as was necessary to comply with § 4942. We need not resolve the trustees' challenge to the judge's conclusion that, by distributing "principal," the trustees breached their fiduciary duties because we conclude that there are sufficient other grounds to remove the trustees. The successor trustees shall, however, take such actions as are necessary to ensure compliance with § 4942 by all of the Crabtree trusts subject to § 4942.[33]

---

carrying out the foundation's exempt purpose, reduced by acquisition indebtedness. See § 4942(e). A private foundation that fails to make such distributions is subject (in the first year it fails to do so) to a fifteen per cent tax on the difference between the amount distributed and the five per cent "minimum investment return" value. The Pension Protection Act of 2006 doubled all private foundation excise taxes; the tax in the future (effective for tax years after the date of enactment) will be thirty per cent. See Pub. L. 109-280, § 1212(b) (2006).

Under § 4942(b), "[i]n any case in which an initial tax is imposed under subsection (a) on the undistributed income of a private foundation for any taxable year, if any portion of such income remains undistributed at the close of the taxable period, there is hereby imposed a tax equal to 100 percent of the amount remaining undistributed at the time." The tax is imposed at the end of year two, and every year thereafter. See *Hammond* v. *United States, supra* ("To prevent undue accumulation of income by foundations, § 4942(b) imposes on the foundation a tax of 100% of the amount by which the foundation's total annual distributions for charitable purposes fall short of the foundation's adjusted net income or 5% of the foundation's net assets, whichever is greater").

[33]In *U.S. Trust Co., N.A.* v. *Attorney Gen.*, 447 Mass. 523 (2006), we addressed the tax on undistributed income imposed by I.R.C. § 4942 in the context of a request by the trustee of a charitable trust, established for the purpose of awarding annual scholarships to graduating students in the town of Plymouth (the scholarship trust), to reform the trust by increasing the aggregate amount of scholarship money available annually. A claimed purpose behind the proposed reformation was to avoid annual tax liability of fifteen per cent of undistributed income incurred by the trust under I.R.C. § 4942(a). See *id.* at 528-529.

Relying on figures submitted in a statement of agreed material facts and law, we denied the trustee's request. See *id.* at 529-530. Our decision was based on the likelihood that the proposed reformation would operate to deplete the trust principal at a dramatic rate, in direct contravention of the settlor's express intent to provide scholarships "in perpetuity." See *id.* at 529. Counsel

4. *Fraud on the court.* The judge concluded that the trustees committed a "fraud on the Court" by failing to disclose that the trustees' fees for all seven trusts were paid from the agricultural fund trust.[34] The GAL presses the point on appeal because a finding of fraud is a necessary prerequisite to reopening accounts of the trustees now closed.[35] See G. L. c. 206, § 24 ("After a final decree has been entered on any account hereunder it shall not be impeached except for fraud or manifest error"). On our review of the record we conclude that, while these trustees committed serious breaches of their fiduciary duty, neither the conduct of the trustees singled out by the judge nor their conduct in any other respect constitutes either "fraud on the Court" or, as we shall explain, fraud as contemplated by G. L. c. 206, § 24.

We consider first the judge's conclusion that the trustees committed a fraud on the court. "Fraud on the Court" is a term of art in our jurisprudence. The test as to whether an individual has perpetrated a fraud on the court is stringent, *Paternity of Cheryl*, 434 Mass. 23, 35-36 (2001), and a party generally will not be liable for fraud on the court unless "it can be demonstrated, clearly and convincingly, that [the] party has sentiently

confirmed, at oral argument, that the annual tax imposed by § 4942(a) would amount to "not a remarkably large sum," and the trustee conceded that the tax could be paid out of the trust income. The effect of the additional tax penalty imposed by § 4942(b) was not brought to our attention before our decision issued. It is now apparent that our reasoning on the matter, see *id.* at 528-529, rested on incomplete information and, therefore, is incorrect and creates a precedent that should not be followed in like situations. The trustee of the scholarship trust may, in the future, wish to seek further reformation of the trust. In fairness to the trustee, and in order to achieve consistency in our treatment of similarly situated parties who appear before us, we then will reconsider our decision as to the trust in issue in that case.

[34]Specifically, the judge ruled that the "failure of the trustees of the [agricultural fund trust] to disclose in their accounts, which they signed under the penalties of perjury, that the trustees' fees for all seven trusts were paid by the [agricultural fund trust] was a fraud on the Court."

[35]In his initial report, the GAL did not mention fraud and did not recommend that the settled accounts from prior years be reopened. Later, in his closing argument at trial, the GAL requested that the trustees repay to the agricultural fund trust "all excessive compensation paid to them during the years they have been acting as trustees." In his proposed conclusions of law, he specifically requested that the judge make a finding of fraud as a prerequisite for the reopening of settled accounts. See G. L. c. 206, § 24.

set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Rockdale Mgt. Co.* v. *Shawmut Bank, N.A.*, 418 Mass. 596, 598 (1994), quoting *Aoude* v. *Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989). Examples of "fraud on the Court" include "bribery of judges, employment of counsel to 'influence' the court, [and] involvement of an attorney (an officer of the court) in the perpetration of fraud." *MacDonald* v. *MacDonald*, 407 Mass. 196, 202 (1990), quoting *Lockwood* v. *Bowles*, 46 F.R.D. 625, 631-632 (D.D.C. 1969). A finding of "fraud on the Court" carries severe disciplinary consequences for attorneys. See *Matter of McCarthy*, 416 Mass. 423, 431 (1993); *Matter of Neitlich*, 413 Mass. 416, 423 (1992). Evidence of such conduct by the trustees is not present here.

It may be that the judge intended the term "fraud on the Court" to mean "fraud" as used in G. L. c. 206, § 24, although he made no reference to that statute. If so, we are not persuaded that such fraud has been established in this case. The GAL relied on *National Academy of Sciences* v. *Cambridge Trust Co.*, 370 Mass. 303, 309 (1976) (National Academy), in which we held that "constructive fraud" constitutes "fraud" for purposes of G. L. c. 206, § 24, "at least to the extent that the fiduciary has made no reasonable efforts to ascertain the true state of the facts it has misrepresented in the accounts." *Id.* at 308. In *National Academy*, the testator created a testamentary trust naming his wife as beneficiary so long as she remained unmarried following his death. The widow remarried. The bank-trustee having made no effort to ascertain the widow's marital status, and represented in its accounts for many years that the widow remained unmarried.

No such factual affirmative misrepresentations were made by the Crabtree trustees; the accounts of the agricultural fund trust reflect (accurately) the amount of fees charged to that trust, as do the other trust accounts. Moreover, in *National Academy* "the fact of the widow's remarriage was not discernible from the most scrupulous examination of the accounts." *Id.* at 310. Here, it is apparent on the face of the accounts that a vastly

disproportionate amount of trustees' fees were being charged to the agricultural fund trust alone. We recognize that the accounts did not disclose that the agricultural fund trust account was being used in effect as an operating fund for the expenses of the other trusts. Nevertheless, allowance of the accounts could have been challenged on the basis either that the disproportionate fees were being paid from that fund or that the fees were facially excessive.

As we noted earlier, the judge succinctly pinpointed the crux of this case when he stated that the conduct of the trustees "have made it clear that they do not understand that there are seven separate and distinct trusts, each with separate purposes and funding." See note 29, *supra*. The conduct of the trustees in charging the fees for all accounts to the agricultural fund trust account, while sufficient in this case to warrant removal, does not rise to the level of fraud as contemplated by G. L. c. 206, § 24. See *O'Brien* v. *Dwight*, 363 Mass. 256, 284-285 (1973) (breach of fiduciary duty, although often predicate finding to finding of fraud, is not necessarily coterminous with such finding).

5. *Administrative expenses surcharged to the trustees.* The probate judge surcharged the trustees personally for certain administrative expenses paid separately by the trusts,[36] concluding that such expenses are "customarily" included in fees paid to trustees.[37] The GAL concedes that it is permissible for a trustee to charge such expenses directly to a trust, but argues that there was no error here because the judge sought to establish a "reasonable" over-all fee, taking into consideration the numerous breaches of fiduciary duty by the trustees. Keeping in mind the judge's substantial reduction of trustees' fees, which we affirm, we conclude that the administrative expense surcharge is not warranted.

The allowance of trustee expenses, like the allowance of

---

[36]The expenses were for accounting services not connected to tax preparation, secretarial assistance, payroll taxes, and rent.

[37]The judge surcharged the trustees what he concluded were improperly charged expenses of $23,037.47 for 1999 out of a total of $38,575.26 in trustees' fees allowed for that year, and $24,415.69 in improperly charged expenses for the period covered by the sixth and final accounts out of a total of $28,400 in trustees' fees allowed for that period.

trustee compensation, is a matter left largely to the judge's discretion. *McMahon* v. *Krapf*, 323 Mass. 118, 123 (1948). See G. L. c. 206, § 16 (trustee shall be allowed "reasonable expenses, costs and counsel fees incurred in the execution of his trust, and shall have such compensation for services as the court may allow"). A decision to allow or disallow expenses "is also within the judge's discretion, and, unless clearly erroneous, ought not be disturbed." *Rhode Island Hosp. Trust Nat'l Bank* v. *Burns*, 12 Mass. App. Ct. 251, 255 (1981).

A trustee is entitled to indemnification of "proper expenses" paid either out-of-pocket or directly by the trust. See Restatement (Third) of Trusts § 38(2) (2003) ("A trustee is entitled to indemnity out of the trust estate for expenses properly incurred in the administration of the trust"). See also Restatement (Second) of Trusts § 244 comment b (1959) (same). Moreover, Massachusetts law does not forbid a trustee from charging expenses separately from fees. See, e.g., *Chase* v. *Pevear*, 383 Mass. 350, 361 (1981) (expenses for investment advisor paid from trust fund); *Lipsitt* v. *Sweeney*, 317 Mass. 706, 715 (1945) (accounting expenses paid from trust funds); *Shirk* v. *Walker*, 298 Mass. 251, 255-256 (1937) (secretarial services paid from trust funds).

Although the judge was critical of both the manner in which some of the expenses were incurred, and the trustees' lack of specificity in disclosing certain expenses in their accounts, he did not find the administrative expenses to be unreasonable, either in type or in cost. The trustees' practice of charging expenses separately from fees was disclosed in all of their accounts. In these circumstances, the judge's reliance on "customary" practices was, without more, an insufficient ground for surcharging the trustees for administrative expenses incurred by the trust.

6. *Expert testimony*. The trustees sought to introduce the expert testimony of James Pitts, the senior vice president for finance and administration of The Boston Foundation, as to how fees charged by philanthropic entities for grant-making services are calculated, and as to the over-all reasonableness of the fees charged by the Crabtree trustees. Pitts was permitted to testify as an expert as to the former, but, the trustees argue and

the Appeals Court agreed, the trustees were prejudiced by the judge's refusal to qualify Pitts as an expert as to the reasonableness of the trustees' fees. On reviewing the record, we conclude that there was no error.

The admission of expert testimony is "largely within the discretion of the trial judge and will be reversed only where it constitutes an abuse of discretion or error of law." *Adoption of Hugo*, 428 Mass. 219, 232 (1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 104 (1999), quoting *Commonwealth* v. *Pikul*, 400 Mass. 650, 643 (1987). "The 'crucial issue' in determining whether a witness is qualified to give an expert opinion 'is "whether the witness has sufficient education, training, experience and familiarity" with the subject matter of the testimony.' " *Commonwealth* v. *Rice*, 441 Mass. 291, 298 (2004), quoting *Commonwealth* v. *Richardson*, 423 Mass. 180, 183 (1996).

The judge acted well within his discretion to determine that Pitts's "familiarity with the subject matter of the testimony," *Commonwealth* v. *Rice, supra*, did not qualify him to testify as to the reasonableness of trustees' fees. The trustees stated that their compensation was calculated on the "basis customary to Boston trustees, i.e. law firms and banks managing trust assets." Pitts, the officer of a public charity, is not an attorney, had never acted as a trustee, had never filed a probate account, and had not previously testified concerning the reasonableness of trustees' fees such as those at issue in this case.

In any event, any conceivable error the judge may have made was harmless. Pitts's testimony would largely have duplicated the testimony of the trustees' other expert, Puzo,[38] who testified at length concerning the reasonableness of the trustees' fees. "It is . . . within the discretion of the judge to exclude excessively cumulative evidence, including expert testimony." *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 482 (1991).

7. *Joinder.* The trustees argue that the judge's decision to hold Harney and Naughton jointly and severally liable without joining the estate of the deceased trustee Lyons was error. The

---

[38]Whenever the judge sustained an objection to a question posed to Pitts by trustee counsel, counsel made an offer of proof. Accordingly, the substance of Pitts's excluded testimony is apparent from the record.

issue, raised for the first time on appeal, is waived. See *Commonwealth* v. *Bettencourt*, 447 Mass. 631, 633-634 (2006). Moreover, as far as we can discern, Harney and Naughton have taken no action to join Lyons's estate as a party in these proceedings. See *McMahon* v. *Krapf*, 323 Mass. 118, 129 (1948) (trustee liable for breach of trust entitled to maintain same cause of action against cotrustee). See also *Flannery* v. *Flannery*, 429 Mass. 55, 57 (1999) (action against an estate may be maintained under G. L. c. 197, § 13, for liability arising more than one year after date of death, provided estate still open).

8. *Conclusion.* The orders of the Probate and Family Court removing the trustees are affirmed. The orders concerning the trustees' fees are affirmed. The conclusion that the trustees committed a fraud on the court is reversed. The orders imposing surcharges on the trustees for administrative expenses are reversed.[39]

*So ordered.*

---

[39]The GAL is authorized to seek such reasonable attorney's fees and costs as this court deems appropriate, pursuant to G. L. c. 201, § 35, by filing with the clerk of the court for the Commonwealth a request for fees and costs submitted in accordance with the procedure set forth in *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004).