THOMAS N. O'CONNOR & another,[1] trustees,[2] & another[3] *vs.*
SUMNER M. REDSTONE & others.[4]

Suffolk. April 8, 2008. - November 7, 2008.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Practice, Civil,* Summary judgment, Statute of limitations. *Fiduciary. Limita-
tions, Statute of. Trust,* Beneficiary, Breach of trust.

Discussion of the legal principles governing a trial court judge's grant of sum-
mary judgment on statute of limitations grounds in a civil action involving
a claim of breach of fiduciary duty by a trustee [550-551], and the standard
of inquiry used to determine when a successor trustee's knowledge triggers
the running of the statute of limitations in a claim against a predecessor
trustee for a breach of fiduciary duty [551-554].

In a civil action involving claims by trustees (plaintiffs) that predecessor
trustees (defendants) had committed a breach of their fiduciary duties to
the beneficiaries in connection with the redemption of shares in a family
business that the defendants at various times had held in trust for the bene-
ficiaries, the judge erred in concluding that one claim based on a 1972
redemption was barred by the applicable three-year statute of limitations,
where the record indicated that the limitations period had been tolled
because successor trustees (i.e., trustees appointed after the defendants but
before the plaintiffs), who had knowledge of the 1972 redemption, either
had aided the defendants in the redemption or had acted as an agent of one
defendant [554-559]; however, the judge properly concluded that one claim
involving a 1984 redemption was time barred, where the record indicated
that a successor trustee possessed the requisite knowledge of the claim to
start the running of the statute of limitations, and the limitations period had
not been tolled, as the successor trustee had no disqualifying agency or other
relationship to the alleged wrongdoer [559-563].

CIVIL ACTION commenced in the Superior Court Department on
November 3, 2006.

The case was heard by *Allan van Gestel,* J., on a motion for
summary judgment.

---

[1]Patricia Gatto.

[2]Of the Michael Redstone Trust, the Ruth Ann Redstone Trust, and the
Michael David Redstone Trust.

[3]Michael David Redstone.

[4]Edward S. Redstone and National Amusements, Inc. (NAI).

The Supreme Judicial Court granted an application for direct appellate review.

*William H. Narwold*, of Connecticut (*Mark E. Swirbalus & William Shields, III*, with him) for the plaintiffs.

*Michael B. Keating* (*Elisa K. Nethercott & Jeffrey S. Follett* with him) for Sumner M. Redstone & another.

*Howard J. Castleman* for Edward S. Redstone.

MARSHALL, C.J. At the center of this case are claims that Sumner M. Redstone and his brother, Edward, breached their fiduciary duties to their children in connection with the redemption of shares in a family business, National Amusements, Inc. (NAI), that Sumner and Edward at various times held in trust for their children. Sumner's children are Brent and Shari; Edward's children are Ruth Ann and Michael David (Michael). The plaintiffs are Michael and the current trustees of three trusts that once held shares in NAI for the benefit of Sumner's and Edward's children.

The plaintiffs commenced their action in the Superior Court in 2006, complaining about redemptions of NAI stock that occurred decades earlier, in 1972 and 1984. They claim that in 1972, Edward wrongfully converted shares of NAI that he allegedly had been holding in trust for Ruth Ann and Michael, and sold those shares to NAI pursuant to a redemption agreement authorized by Sumner personally and on NAI's behalf (the plaintiffs claim that Sumner aided and abetted Edward's wrongdoing). The plaintiffs also claim that, in 1984, Sumner orchestrated the redemption of additional shares of NAI held in trust for Ruth Ann and Michael, as well as shares held in trust for Brent and Shari, for inadequate consideration. Through the two redemptions, Edward (as to the first) and Sumner (as to both) allegedly breached their fiduciary duties and duties of loyalty, engaged in self-dealing, and became unjustly enriched. See G. L. c. 203, § 14A (personal liability of trustee for breach of trust). The plaintiffs seek rescission of the redemptions and reconveyance of the redeemed shares, or money damages representing the current value of those shares; they also seek disgorgement of all profits realized by Sumner and Edward pursuant to the redemptions.

As for the plaintiffs' delay in commencing their action, they

claim that they did not become aware of their claims until 2004, when, in connection with unrelated family litigation, documents and other information concerning the 1972 and 1984 redemptions were discovered. The defendants — Sumner, Edward, and NAI — moved to dismiss the action, principally on statute of limitations grounds (each brother filed his own motion; NAI joined Sumner's).[5] They argued that the three-year statute of limitations applicable to claims for breaches of fiduciary duty, G. L. c. 260, § 2A, expired in 1987 because the operative facts underlying the plaintiffs' claims were known in 1984 to a successor trustee, James R. DeGiacomo. They also claimed that, in 1984, Michael (who was then approximately twenty-seven years old) had the requisite knowledge, at least of the 1984 redemption, for the statute of limitations to commence on his claim regarding that redemption. In support of their motions, the defendants filed numerous exhibits relating to the redemptions.

A judge in the Superior Court, noting that the statute of limitations claims were "strongly presented," but "rest . . . in significant part on facts outside the four corners of the complaint," denied the motions to dismiss without prejudice to the defendants' raising the same claims at a later juncture. The judge stayed discovery except for that which he deemed relevant to the statute of limitations issue: the deposition of DeGiacomo and the production of NAI's financial statements from 1983 and 1984.[6]

Following discovery as limited by the judge, the defendants jointly moved for summary judgment solely on statute of limitations grounds. The judge allowed the defendants' motion. The

---

[5]The defendants also argued that the trustee plaintiffs, appointed in 2006, lack standing because the trusts allegedly expired by their own terms no later than 2004. That issue was neither resolved in the trial court nor briefed before this court, and we do not address it. Moreover, the trustee plaintiffs, "out of an abundance of caution to obtain judicial confirmation that the trusts at issue have not terminated by their terms," have initiated trust interpretation actions, which are currently pending in the Probate and Family Court.

[6]The defendants had moved that the judge defer all discovery other than that relative to whether DeGiacomo's knowledge of the facts underlying the redemptions could be attributed to the plaintiffs — specifically, whether De-Giacomo was "conflicted" in 1984 such that his knowledge could not be attributed to the plaintiffs. The plaintiffs opposed the motion unsuccessfully (except with regard to NAI's financial statements from 1983 and 1984). The plaintiffs argued that discovery on the statute of limitations issue was "inextricably intertwined with discovery on liability."

judge concluded that, as of 1984, DeGiacomo had the requisite knowledge of both the 1972 and 1984 redemptions "to have brought suit against Sumner and Edward for any breaches of their fiduciary duties." Relying on *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 523 (1997), the judge opined that the three-year statute of limitations "would seem to begin to run against a trust and its beneficiaries when knowledge is gained by a prior trustee not involved in a predecessor's malfeasance." The judge also concluded that, in 1984, Michael had the requisite knowledge of the 1984 redemption to start the running of the limitations clock on his claims concerning that redemption.[7] According to the judge, none of the plaintiffs "demonstrated facts that take this case outside the impact of the three-year statute of limitations."

The plaintiffs appealed. We granted their application for direct appellate review. For the reasons that follow, we affirm in part and vacate in part the judge's allowance of the defendants' joint motion for summary judgment.

1. *Background.* In 1959, Michael "Mickey" Redstone (Mickey), the father of Sumner and Edward, formed NAI as a closely held corporation to own and operate open-air movie theaters. Mickey caused 300 shares to issue, one hundred registered in his name and one hundred registered in the names of each of his two sons. See generally 12 W.M. Fletcher, Private Corporations § 5489 (rev. ed. 2004) (discussing purposes of registering stock transfers on corporate books, including identifying shareholders). No copies of any stock certificates appear in the record.

---

[7]The judge concluded, sua sponte, that Michael would "appear" only to have "equitable rights to proceed against *current* trustees" (emphasis added), and that only the current trustees (Thomas N. O'Connor and Patricia Gatto) can bring claims against the prior trustees (Sumner and Edward). On appeal, the defendants echo the judge's point, relying on Godfrey *vs.* Kamin, U.S. Dist. Ct., No. 99-C-3230 (N.D. Ill. Dec. 14, 2000), citing *Axelrod* v. *Giambalvo,* 129 Ill. App. 3d 512, 518 (1984); *Turner* v. *Trust Co. of Ga.,* 214 Ga. 339, 345 (1958); *Slaughter* v. *Swicegood,* 162 N.C. App. 457, 466-467 (2004); Restatement (Second) of Trusts § 282 (1959). It has yet to be determined, however, whether the current trustees are proper plaintiffs. See note 5, *supra.* Accordingly, it would be premature to decide whether Michael has standing. See Restatement (Second) of Trusts, *supra* ("beneficiary cannot maintain a suit in equity against [a] third person, except . . . if there is no trustee [and] suit is necessary to protect the interest of the beneficiary").

In 1968, Mickey created the Michael Redstone Trust (Grandchildren's Trust) for the benefit of Sumner's and Edward's children, and their heirs. At the time, Sumner's children, Brent and Shari, were approximately eighteen and fourteen years old; Edward's children, Ruth Ann and Michael, were approximately fourteen and eleven years old. Mickey funded the trust with his remaining fifty shares in NAI (sometime earlier, NAI had redeemed Mickey's other fifty shares). The Grandchildren's Trust specified that the fifty shares were to be divided in equal parts among the four grandchildren — i.e., that twelve and one-half shares would be held in trust for each grandchild. The trustees of the trust were Mickey's wife, Bella; Sumner; and Edward. The trust included no specific provision addressing the procedure to be followed in case the shares were redeemed by NAI. The principal of the trust was to be distributed to each beneficiary when he or she reached thirty-five years of age.

a. *The 1972 redemption.* In the late 1960's, disagreements arose between Mickey and Sumner on the one hand and Edward on the other, resulting in Edward's leaving NAI in 1971. At the time, Edward was an employee of NAI; Mickey was withdrawing from NAI but was still involved with decisions that affected the company; and Sumner was president, chief executive officer, and chairman of the board of directors. Edward demanded but did not receive the one hundred shares registered in his name.

Edward then retained attorney James R. DeGiacomo to help him obtain the shares. Toward that end, DeGiacomo commenced two actions in the Superior Court against Mickey, Sumner, NAI, and Northeast Theater Corporation (an affiliate of NAI). Thereafter, DeGiacomo, on behalf of Edward, engaged in settlement negotiations with Sumner and Mickey. At an early point in the negotiations, DeGiacomo explored whether Edward could remain associated with the family business in some capacity. When it became clear that such a resolution was impossible, the negotiations focused on the redemption of Edward's shares of NAI.

During the negotiations, there was disagreement about Edward's entitlement to all one hundred shares registered in his name. Mickey and Sumner contended that Edward was entitled at most to fifty shares because, according to Mickey and Sumner, in

1959, in connection with the issuance of the one hundred shares registered in the names each of Sumner and Edward, Mickey had established oral trusts whereby Sumner and Edward, as trustees, each held fifty shares of NAI in trust for their respective children and fifty shares individually. Edward denied that any such oral trusts had been established.[8]

The dispute over Edward's ownership of the shares was settled in 1972. The settlement was reduced to a written agreement. De-Giacomo negotiated the terms of the agreement. The agreement provided, among other things, that since NAI's formation (in 1959), Edward had been "holding a certain portion" of the one hundred shares registered in his name for the benefit of his children, but that Edward "dispute[d] the percentage thereof." The agreement further stated that Mickey "has asserted" that, when NAI was formed, "there was an agreement" that "not less than 50%" of the stock registered in Edward's name would be "held by him in trust for the benefit of his children," and that Edward "did not own said 50% . . . though registered in his name."[9]

The settlement agreement represented a "compromise" (in DeGiacomo's words), through which the parties agreed that Edward owned sixty-six and two-thirds shares of NAI; that he

---

[8]As noted earlier, the record contains no copies of NAI stock certificates. There is also nothing in the record to suggest that any actions taken by NAI between 1959 and 1972 were done with the consent of the grandchildren (through any alleged trustee). See 12 W.M. Fletcher, Private Corporations § 5489, at 254 (rev. ed. 2004).

[9]DeGiacomo testified in his 2007 deposition that he never saw a stock certificate stating that Edward was holding any shares in trust, nor was there any evidence, at the time of the 1972 redemption, that Mickey had in any way restricted the shares registered to Edward. See 12 W.M. Fletcher, Private Corporations, *supra* at 257 (requirement that issuer register transfer of security "intended for the benefit and protection of persons who may purchase or take a pledge of the shares of the corporation"). During the negotiations, Mickey never said that he had told Edward in 1959 that he wanted Edward's children to own an interest in NAI. DeGiacomo never heard nor saw any evidence that Mickey had paid gift taxes in 1959 as part of Mickey's alleged gift to his grandchildren through the alleged oral trusts. In addition, DeGiacomo never saw any written evidence suggesting that Mickey had created oral trusts in 1959. DeGiacomo further testified that in 1972 he did not know whether Mickey's view that he had created oral trusts in 1959 was genuine or merely a litigation position, but DeGiacomo believed that "if we went to court and litigated [the question, Mickey] would have lost."

would sell those shares to NAI for $5 million; and that with respect to the remaining thirty-three and one-third shares registered to him, he would execute written, irrevocable declarations of trust for Ruth Ann and Michael — each trust to hold sixteen and two-thirds shares of NAI. Thus, the total number of shares Edward agreed to be put in trust were sixteen and two-thirds fewer than the fifty shares that Mickey and Sumner alleged Edward held pursuant to the preexisting oral trusts.[10] The parties also agreed that Sumner would be appointed as initial sole trustee of both trusts (Ruth Ann's and Michael's); that Edward would serve as trustee of neither trust; and that Edward would relinquish his role as cotrustee of the Grandchildren's Trust (he was replaced by NAI's general counsel, Louis Winer; Winer joined Bella and Sumner as cotrustee). The settlement agreement was signed by all of the parties to the two actions that DeGiacomo had filed on Edward's behalf, and by DeGiacomo as a witness. Sumner signed in both his individual capacity and as president of NAI. Pursuant to the terms of the settlement agreement, NAI paid DeGiacomo $135,000 in attorney's fees for his work on the settlement.

In a separate agreement signed by Edward and Sumner (as president of NAI), NAI redeemed Edward's sixty-six and two-thirds shares for $5 million; payment was made solely to Edward.[11] Edward also executed irrevocable declarations of trust for Ruth Ann and Michael, and their heirs — the Ruth Ann Redstone

---

[10]Whether the parties had the authority to agree to such a compromise — or whether Mickey created oral trusts in 1959 that could be neither revoked nor modified — is the question underlying the plaintiffs' theory that Ruth Ann and Michael were wrongfully deprived of shares to which they were entitled. See generally *Cooney* v. *Montana*, 347 Mass. 29, 34-35 (1964) (discussing creation and proof of oral trusts for personal property); Restatement (Third) of Trusts § 63(1), (2) comments c, c(1) (2003) (where settlor fails expressly to reserve right to revoke or amend trust, rebuttable presumption that settlor lacks power to do so unless he retains interest in trust). Accord Restatement (Second) of Trusts, *supra* at § 330 comment c, § 331 comment a.

[11]As for the one hundred shares of NAI registered in Sumner's name, he, like Edward, at the time of the 1972 settlement ended up owning sixty-six and two-thirds of them, while the remaining thirty-three and one-third were held in trust for his two children. The record does not show that irrevocable declarations of trust were set up for Brent and Shari. In any event, none of those shares was redeemed in 1972 or 1984. Moreover, the case at bar involves no claim that Sumner converted shares to which his children Brent or Shari were allegedly entitled under preexisting oral trusts.

Trust (Ruth Ann Trust) and the Michael David Redstone Trust (Michael Trust) — with each trust holding sixteen and two-thirds shares of NAI. Sumner and DeGiacomo negotiated the provisions of those trusts.[12]

The trusts stated, in pertinent part, that they were intended to "memorialize" prior "oral trust[s]" under which Edward had been holding shares of NAI for Ruth Ann's and Michael's benefit; that neither Ruth Ann nor Michael was entitled to receive any principal of the trusts before reaching forty years of age; that Sumner would serve as sole trustee of each trust (with the power to appoint successor trustees); that the trustee (initially Sumner) could sell the shares of NAI held in each trust if he determined such a sale to be in the beneficiaries' best interests; and that the trustee (initially Sumner) would be immune from any liability in connection with such a sale.[13] In the event of a proposed sale of the shares, NAI would have the right of first refusal; arbitration proceedings could be used to arrive at an agreeable sale price; and the interests of the beneficiaries "shall be represented by independent counsel selected and compensated by the trustee [initially Sumner] . . . out of trust funds."

At the time of the 1972 settlement and redemption, Ruth Ann was approximately eighteen years old, and Michael was fifteen years old; neither was represented by a guardian ad litem or independent counsel. Shortly after the redemption, DeGiacomo met with Ruth Ann and explained that there had been a "dispute over the ownership of shares," and that some of the shares had been placed in trusts for the benefit of her and Michael. The record does not indicate, however, whether Ruth Ann knew specifically of Mickey's and Sumner's position that fifty shares of NAI had been held in oral trusts for Ruth Ann and Michael since 1959. DeGiacomo did not discuss the redemption with Michael.

b. *The 1984 redemption.* To effectuate Ruth Ann's and

---

[12]In a deposition of Edward taken in 2004 in connection with unrelated family litigation, Edward maintained that he did not pay attention to the language of the settlement agreement, redemption agreement, or trust documents that he signed in 1972 because he was "under duress . . . frankly I signed everything that would be put in front of me just to get away from them."

[13]The defendants did not raise this immunity as a defense in this action.

Michael's expressed desires that their shares be redeemed, Sumner, in 1982, began exploring the possibility of NAI's redeeming the shares held in the Ruth Ann, Michael, and Grandchildren's Trusts. In December, 1982, Sumner appointed DeGiacomo — who had represented Edward in the 1972 dispute — as independent counsel for the beneficiaries of the Ruth Ann and Michael Trusts. In that role, DeGiacomo considered it his duty to determine whether a redemption was in the best interest of the beneficiaries, and to determine the fair value of the shares to be redeemed.[14] The shares were nondividend-paying and nonmarketable.

Although there was no provision in the Grandchildren's Trust for the appointment of an independent counsel, DeGiacomo considered his role as independent counsel under the Ruth Ann and Michael Trusts to include representing the interests of Ruth Ann and Michael vis-à-vis their shares held in the Grandchildren's Trust. With respect to the other beneficiaries of the Grandchildren's Trust, Brent and Shari, DeGiacomo did not consider himself to be acting as independent counsel for them, although he thought that his determination as to the fairness of the redemption of Ruth Ann's and Michael's shares would apply to Brent's and Shari's shares.

Sumner asked Samuel Rosen, a certified public accountant, to appraise the fair market value of the fifty-eight and one-third shares of NAI held in trust for Ruth Ann and Michael (thirty-three and one-third shares held in the Ruth Ann and Michael Trusts, and twenty-five shares held in the Grandchildren's Trust for Ruth Ann's and Michael's benefit). Rosen was NAI's accountant and was both Sumner's and Edward's personal accountant. In February, 1983, Rosen placed the value of the fifty-eight and one-third shares at $9.9 million.[15] Rosen delivered

---

[14]In a 2004 deposition in connection with unrelated Redstone family litigation, DeGiacomo referred to Sumner as a "client[]" whom he was "representing" in connection with the 1984 redemption. But in his 2007 deposition, he explained that, by referring to Sumner as his "client" in the 2004 deposition, he meant only that Sumner had been the one who designated DeGiacomo as independent counsel for the trust beneficiaries — not that Sumner was a client of his in the attorney-client sense. DeGiacomo further explained (both in his 2004 and 2007 depositions) that he never represented Sumner as Sumner's attorney.

[15]Approximately one month earlier, Rosen had valued the shares at $7.5

a copy of his valuation and the financial information on which it was based to DeGiacomo.

DeGiacomo then obtained independent expert reviews of Rosen's valuation by four Citibank representatives, including Citibank vice-president Samuel D. Daume (at Edward's recommendation; Daume had been Edward's banker). According to DeGiacomo, the Citibank experts concluded that Rosen's valuation was too low because it failed to take into account the value of NAI's real property, the methodology was flawed, and the valuation improperly discounted the value of the shares by thirty-five per cent for lack of marketability of the minority interest.[16]

DeGiacomo involved Edward in reviewing the value of the trust beneficiaries' shares because he considered Edward knowledgeable about the movie theater business. Contrary to Sumner's and Rosen's pessimistic views about the future of the movie theater business based on information showing that the business was suffering losses because of the advent of pay television and other new technologies, Edward pointed to other industry data showing that movie theater ticket sales were still healthy. DeGiacomo thought NAI's attempt to paint itself as a company in decline was mere "posturing."

DeGiacomo informed Sumner that, in order to fulfil his obligations as independent counsel, it was necessary to resolve the question of the value of the shares according to the arbitration

million, but in arriving at that figure he had failed to include NAI's financial statements from 1982. His revised figure took into account the 1982 financial data.

[16]In preparation for obtaining reviews of Rosen's valuation, DeGiacomo supplied the Citibank experts with all of NAI's financial reports forwarded to DeGiacomo by Rosen. DeGiacomo also understood that the Citibank experts examined the business outlook for the movie theater industry as a whole.

Daume testified twenty-four years later in a 2007 deposition that he was no longer employed by Citibank at the time DeGiacomo consulted with him, but said that he had earlier been employed by Citibank. While Daume testified that he was not an expert in formal valuation methods, he attested that he had experience valuing closely held corporations and considered himself an expert in private company valuations in 1984. As for the fairness of Rosen's valuation, Daume testified that he could not recall giving any opinion on the matter, but did not deny that he or any other Citibank representative had done so. Daume's testimony thus does not create a genuine dispute of fact concerning whether he or the other experts had opined that Rosen's valuation was unfair.

provisions in the Ruth Ann and Michael Trusts. Specifically, he proposed that he and Sumner agree on a "high-low" range for the price of the shares and then submit that range to a panel of arbitrators for decision. In the following weeks, DeGiacomo and Sumner continued to disagree about Rosen's valuation — particularly the need to value NAI's real property. Sumner became impatient with DeGiacomo and suggested that he (Sumner) could terminate the redemption process if he wished. DeGiacomo disagreed, threatening that, if Sumner sought to do so, DeGiacomo would take the matter to court. Sumner did not terminate the process.

As the negotiations continued, DeGiacomo proposed to Sumner a "high-low" range of $15 million to $5 million — "a range that would have been discussed with the experts at Citi-[bank]," according to DeGiacomo in 2007. As for the value of NAI's real estate, DeGiacomo testified that, while there were no current valuations available from NAI and no independent appraisal was done, DeGiacomo had property "tax bills," and Edward had "very, very intimate knowledge" of NAI's real property. Sumner countered DeGiacomo's "high-low" range with a range of $12.5 million to $7.5 million. DeGiacomo insisted on his range, however, and Sumner finally agreed to it. But before any arbitration proceedings began, in November 1983 Sumner agreed to NAI's redemption of the shares for $15 million — the top of DeGiacomo's proposed range. DeGiacomo testified that he satisfied himself, with the aid of the Citibank experts and Edward, that the price was fair and in the beneficiaries' best interest. Daume testified that he did not recall what conclusions he had made regarding the fairness of the price, but did not deny that he had opined that the $15 million price was fair. See note 16, *supra.*

During the months leading up to the parties' agreement on the redemption price, DeGiacomo kept abreast of NAI's financial condition. Although he testified, when shown a copy of NAI's 1983 financial statement during his 2007 deposition, that — twenty-four years after the fact — the statement was "unfamiliar" to him, he asserted that, before agreeing on the redemption price, he periodically requested and received current financial information from NAI. For instance, he would ask Sumner for "last

quarter's reports." "I did request [financial] documentation from time to time from [NAI], and . . . it's my recollection that in each instance what I requested was furnished and was then passed on to financial people who were involved. That's my recollection, but I do not have a specific recollection of the documents that were requested or that were received." DeGiacomo knew of no instance when financial documentation was requested from NAI but not provided.[17]

On March 8, 1984, NAI redeemed fifty-eight and one-third shares of NAI held in trust for Ruth Ann and Michael (thirty-three and one-third shares in the Ruth Ann and Michael Trusts, and twenty-five shares in the Grandchildren's Trust held for Ruth Ann's and Michael's benefit) for $15 million — $5.1 million more than Rosen's valuation. NAI also redeemed the remaining twenty-five shares in the Grandchildren's Trust, held for Brent's and Shari's benefit, for $6.4 million. The total price paid for all of the redeemed shares was $21.4 million. Payment was made to the trusts.

On the day of the redemption, immediately before it took place, Sumner appointed Rosen to serve as cotrustee with Sumner of the Ruth Ann and Michael Trusts. Also before the redemption took place (during the previous month), Rosen was appointed a cotrustee of the Grandchildren's Trust (Rosen replaced Bella, joining Sumner and Winer as cotrustee). The redemption was reduced to a written agreement, which was signed on March 8, 1984, as follows: Sumner as president of NAI; Sumner and Rosen as cotrustees of the Ruth Ann and Michael Trusts; Sumner, Rosen, and Winer as cotrustees of the Grandchildren's Trust; and DeGiacomo as independent counsel.[18,19] With respect to

---

[17]DeGiacomo did not recall whether in 1984 he saw NAI's financial statements for fiscal year 1984 (ending August 30, 1984), but he explained that, for purposes of the March 8, 1984, redemption, it was the financial information current as of that date that would have been helpful to determining the fairness of the redemption price.

[18]DeGiacomo was paid $27,000 in attorney's fees from the Grandchildren's Trust for his work as independent counsel, although that trust did not provide for the appointment of an independent counsel. The record does not indicate whether DeGiacomo was paid for his work as independent counsel from the Ruth Ann Trust or the Michael Trust, or whether he received commissions as trustee of those trusts.

[19]The redemption agreement stated, among other things, that "the parties,

DeGiacomo's role vis-à-vis the Grandchildren's Trust, the redemption agreement stated that DeGiacomo "requested that all of the [NAI] shares held by The Grandchildren's Trust be redeemed by [NAI]." The agreement also stated that the trustees of the Grandchildren's Trust concurred in the determination of DeGiacomo, Sumner, and Rosen that "it is in the interest of [Ruth Ann and Michael] as well as the other beneficiaries of The Grandchildren's Trust that the [NAI] shares held by The Grandchildren's Trust be redeemed by [NAI]."

On the same day the agreement was signed, Brent, Shari, and Michael — by that time, all adults — signed a statement asserting that they "urged, and do approve and endorse the redemption . . . at the price and in accordance with the terms and conditions of the redemption agreement." Ruth Ann's signature does not appear on the document; at the time of the redemption she had been missing for some time.[20] DeGiacomo testified in 2007 that he did not recall consulting with Michael about the redemption in 1984.

According to the affidavit of Thomas M. Blake, an accountant retained by the plaintiffs for purposes of this litigation, the redemption price "materially underestimated the value of NAI's common stock as of the [t]ransaction date." Acknowledging that his analysis was only "preliminary," Blake concluded that Rosen's methodology was flawed. Blake also concluded that the value of NAI's income, assets, and investments as reflected in its financial statements — particularly those from 1983 and 1984 (after Rosen had produced his valuation) — showed that the redeemed shares held in trust for Ruth Ann and Michael were worth approximately three to five times the $15 million paid.

The day after the redemption agreement was signed, the trustees of the various trusts changed as follows. Sumner resigned as cotrustee of the Ruth Ann Trust and appointed DeGiacomo to serve as cotrustee with Rosen (DeGiacomo resigned in 1992;

after careful study of the value of the [NAI] stock, including detailed valuations made by [NAI's] accountant, have agreed on a price for the redemption of all [shares in the trusts]."

[20]Ruth Ann died in 1987, in Japan, at the age of thirty-three years. She had a son who was born in 1983; the son died in 2004 at the age of twenty years.

Rosen resigned in 2005). Sumner remained cotrustee with Rosen of the Michael Trust and appointed DeGiacomo to join them (Sumner resigned in 1986; DeGiacomo resigned in 1992; Rosen resigned in 2005). Sumner and Rosen remained cotrustees of the Grandchildren's Trust; Sumner resigned as cotrustee in 1991, and it is not clear for how long Winer remained a cotrustee after the redemption agreement was signed.[21] The current trustees of all three trusts, Thomas N. O'Connor and Patricia Gatto, were appointed in 2006.[22] Although the defendants refer to other trustees who were apparently appointed before the current trustees (George Duncan, William Eisen, and Mark Schuster), the record does not indicate the trusts for which those trustees served or the periods of such service.

Following the 1984 redemption, the only shares of NAI that remained outstanding· were the sixty-six and two-thirds owned by Sumner and the thirty-three and one-third held in trust for his children (of the original 300 shares, NAI had redeemed fifty from Mickey; sixty-six and two-thirds from Edward; fifty from the Grandchildren's Trust; and thirty-three and one-third from the Ruth Ann and Michael Trusts). In other words, in 1984, for the first time Sumner became the majority shareholder of NAI.[23]

2. *Discussion.* Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). *McGuinness* v. *Cotter*, 412 Mass. 617, 620 (1992). In deciding whether summary judgment is appropriate, a judge considers evidence presented in the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. See *id.* The judge views the evidence indulgently in favor of the nonmoving party and without considering witness credibility, weighing the evidence, or making findings of fact.

---

[21]Rosen died in 2006.

[22]The defendants have challenged the legitimacy of those appointments, but the matter has yet to be resolved. See note 5, *supra.*

[23]In 2006, in unrelated family litigation, Brent alleged that, in 1984, Sumner "breached fiduciary duties . . . by arranging for NAI to buy back all of the [Grandchildren's Trust's] stock at a price that was advantageous to the company and to himself personally." Brent alleged no specific facts, however, showing that the stock price was unfairly low. According to the plaintiffs, Brent's action was settled in 2007.

See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991); *Riley* v. *Presnell*, 409 Mass. 239, 244 (1991). However, where summary judgment is sought on the basis of a statute of limitations, "once the defendant establishes that the time period between the plaintiff's injury and the plaintiff's complaint exceeds the limitations period set forth in the applicable statute, the plaintiff bears the burden of alleging facts which would take his or her claim outside the statute." *McGuinness* v. *Cotter, supra,* citing *Riley* v. *Presnell, supra* at 243-244. *Franklin* v. *Albert,* 381 Mass. 611, 619 (1980). Accord *Doe* v. *Creighton,* 439 Mass. 281, 283 (2003); *Lindsay* v. *Romano,* 427 Mass. 771, 773-774 (1998). If the plaintiff responds to a defendant's motion by alleging facts that, if proved at trial, would bring the plaintiff's claims outside the impact of the statute of limitations, then the defendant is not entitled to summary judgment. *McGuinness* v. *Cotter, supra* at 625. Accord *Castillo* v. *Massachusetts Gen. Hosp. Chelsea Memorial Health Care Ctr.,* 38 Mass. App. Ct. 513, 515 n.5 (1995).

In this case the statute of limitations applicable to the plaintiffs' claims for breaches of fiduciary duty is G. L. c. 260, § 2A, which provides for a three-year period of limitation. *Lattuca* v. *Robsham,* 442 Mass. 205, 213 (2004). In their motion for summary judgment, the defendants established that the period between the plaintiffs' alleged injuries (1972 and 1984) and the filing of their complaint (2006) exceeded three years. The plaintiffs were thus required to allege facts that, if proved at trial, would take their claims outside the limitations period. We conclude that the plaintiffs have carried their burden with respect to certain claims but not others. We do so, cognizant of the strong public policy favoring the protection of beneficiaries of fiduciary relationships, and the equally strong public policy of imposing reasonable limits on liability. See *Doe* v. *Harbor Schs., Inc.,* 446 Mass. 245, 256 (2006).

a. *Standard of inquiry.* In cases where a beneficiary has pursued a claim against a trustee directly for breach of fiduciary duty, see Restatement (Second) of Trusts § 199(c) & comment c (1959) (discussing beneficiary's right to maintain suit to compel trustee to redress breach of trust), we have held that the statute of limitations does not commence "until the beneficiary has

actual knowledge of the fiduciary's breach. Constructive knowledge is insufficient." *Lattuca* v. *Robsham, supra.* Accord *Doe* v. *Harbor Schs., Inc., supra* at 254. See *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 518-519 (1997), and cases cited (discussing "actual knowledge" test for claim of trust repudiation in context of shareholder derivative action). In such circumstances, the limitations period does not commence until the beneficiary knows that he has been injured and that his injury was caused by the fiduciary. See *Doe* v. *Harbor Schs., Inc., supra* at 254, 255, 256. This "actual knowledge" rule "recognizes the dependent status of the beneficiary vis-à-vis the fiduciary, and protects the beneficiary's legitimate expectation that the fiduciary will act with the utmost probity in all matters concerning the relationship." *Id.* at 255.

The situation is different, however, where there is a successor trustee — someone not in a "dependent status" vis-à-vis the predecessor trustee who, on behalf of the beneficiary, can pursue a claim for breach of fiduciary duty against the predecessor trustee.[24] "If the trustee commits a breach of trust and . . . ceases to be trustee and a successor trustee is appointed, the successor trustee can maintain a suit against him to redress the breach of trust." Restatement (Second) of Trusts, *supra* at § 200 comment f, at 441. See G.G. Bogert, Trusts and Trustees § 594 (rev. 2d ed. 1980). In fact, a successor trustee "is under a duty to the beneficiary to take reasonable steps to enforce any claim which he holds as trustee against predecessor trustees." Restatement (Second) of Trusts, *supra* at § 177 comment a, at 383. See 5 A.W. Scott & M.L. Ascher, Trusts § 28.1.3 (5th ed. 2008); Loring, A Trustee's Handbook § 7.2.4 (C.E. Rounds ed. 2008). When taking over the administration of a trust, the successor "should obtain an accounting from or review the records of the predecessor trustee . . . . [T]he trustee ordinarily has the associated responsibility of taking reasonable steps to uncover and redress any breach of duty committed by a predecessor fiduciary." Restate-

---

[24]In *Lattuca* v. *Robsham,* 442 Mass. 205 (2004), where an innocent cotrustee and his wife (a trust beneficiary) were the plaintiffs in an action against a wrongdoing cotrustee and a wrongdoing agent of the trust, the plaintiffs gained actual knowledge of the wrongdoing at the same time. *Id.* at 213-215. On those facts, the court declined to consider whether the innocent cotrustee had a duty to investigate the claims earlier than he did. *Id.* at 213 n.11.

ment (Third) of Trusts § 76 comment d, at 70-71 (2007). See Loring, A Trustee's Handbook, *supra* at §§ 3.4.4, 7.2.4; G.G. Bogert, Trusts and Trustees, *supra* at § 583. Accord *Matter of the Trusts Under the Will of Crabtree,* 449 Mass. 128, 138 (2007).[25] If a successor trustee fails to take reasonable steps to fulfil his duty in those regards, he is liable for his own breach. Restatement (Second) of Trusts, *supra* at § 223 & comment d. See 4 A.W. Scott & M.L. Ascher, Trusts § 24.28 (5th ed. 2007); Loring, A Trustee's Handbook, *supra* at § 7.2.4.

In light of the duty of a successor trustee (here, DeGiacomo) to bring a claim for any breach of fiduciary duty against a predecessor trustee (here, Sumner and Edward), the statute of limitations for a claim against a former trustee for breach of fiduciary duty begins to run when the successor trustee knows, or through reasonable diligence should know, of the breach. Cf. Restatement (Second) of Trusts, *supra* at § 327 & comment 1 (beneficiary's action against third party who knowingly participated in breach of trust time barred if successor trustee, knowing of claim against third party, allowed claim to be barred by statute of limitations); G.G. Bogert, Trusts and Trustees, *supra* at § 954, at 675-676 (statute of limitations on claim against third party "applies from the date when the trustee knew or ought to have known of the illegal act").[26] Cf. Restatement (Second) of Trusts, *supra* at § 223(2)(a), at 519 (successor

[25]The Uniform Trust Code (2000), 7C U.L.A. 362 (Master ed. 2006 & Supp. 2008) — adopted by twenty jurisdictions although not Massachusetts — is in accord with the leading treatises regarding a successor trustee's duties vis-à-vis a predecessor trustee. See Uniform Trust Code § 812, 7C U.L.A. 608 ("A trustee shall take reasonable steps to . . . redress a breach of trust known to the trustee to have been committed by a former trustee").

As for when a successor trustee is deemed to have knowledge of a predecessor's breach, see Uniform Trust Code § 104(a), 7C U.L.A. 427 (person has "knowledge of a fact" if he has "actual knowledge of it," "notification of it," or "from all the facts and circumstances known to the person at the time in question, has reason to know it"). Accord Loring, A Trustee's Handbook § 3.4.4 (C.E. Rounds ed. 2008).

[26]Analogizing to common-law principles concerning claims time barred against third parties is apt in the particular circumstances of this case where Sumner and Edward no longer hold title to any trust property and the plaintiffs do not differentiate between the alleged harm done to the trusts and to any individual beneficiary. See Restatement (Second) of Trusts §§ 280-282 (1959) (trustee's duty to pursue claims against third parties for wrongs against trust property). Accord 5 A.W. Scott & M.L. Ascher, Trusts § 28.2 (5th ed. 2008);

trustee liable to beneficiary for breach of trust if he "knows or should know of a situation constituting a breach of trust committed by his predecessor and he improperly permits it to continue"); 5 A.W. Scott & M.L. Ascher, Trusts, *supra* at §§ 28.2, 31.1.1 (beneficiary can proceed against trustee for breach of trust in allowing claim to become time barred); 4 A.W. Scott & W.F. Fratcher, Trusts §§ 282, 327.1 (4th ed. 1989) (same); G.G. Bogert, Trusts and Trustees, *supra* at § 954 (same).[27] The standard is an objective one. Cf. *Riley* v. *Presnell*, *supra* at 245 ("discovery rule" involves asking what reasonable person in plaintiff's position knew or should have known); *Bowen* v. *Eli Lilly & Co.*, 408 Mass. 204, 210 (1990) (same).

b. *1972 redemption.* The plaintiffs allege that, in 1972, Edward breached his fiduciary duty as trustee of oral trusts purportedly created in 1959 by Mickey for Ruth Ann's and Michael's benefit, by converting to himself sixteen and two-thirds of the fifty shares held in the oral trusts. The plaintiffs also claim that Sumner aided and abetted Edward's wrongdoing through Sumner's participation (individually and on behalf of NAI) in the settlement and redemption agreements.[28] The defendants do not argue that the statute of limitations regarding the 1972 redemption commenced based on Ruth Ann's or Michael's actual knowledge of Sumner's and Edward's alleged wrongdoing. In any event, the

G.G. Bogert, Trusts and Trustees § 869 (rev. 2d ed. 1995). For cases treating former trustees as third parties, see Godfrey *vs.* Kamin, U.S. Dist. Ct., No. 99-C-3230 (N.D. Ill. Dec. 14, 2000); *Turner* v. *Trust Co. of Ga.*, 214 Ga. 339, 345 (1958); *Axelrod* v. *Giambalvo*, 129 Ill. App. 3d 512, 518 (1984); *Slaughter* v. *Swicegood*, 162 N.C. App. 457, 466-467 (2004). But see *McPherson* v. *McPherson*, 258 Ark. 257, 266-268 (1975).

[27]Under the Uniform Trust Code, as under common law, a successor trustee's knowledge of a claim against a former trustee binds a beneficiary. See Uniform Trust Code § 1005(a), (b), 7C U.L.A. 650 (one-year limitations period commences when beneficiary "or a representative of the beneficiary" — e.g., successor trustee — has sufficient notice of potential claim). See also Uniform Trust Code Art. III, Representation, General Comment, 7C U.L.A. 466 (Master ed. 2006); Uniform Trust Code § 301(a), 7C U.L.A. 466 (trustee is beneficiary's representative).

[28]At the time of the settlement and redemption agreements, Sumner, like Edward, came to own sixty-six and two-thirds of the shares registered in his name, arguably suggesting that Sumner converted sixteen and two-thirds of his own children's shares. Sumner's children have not, however, challenged in this action (or any other of which we are aware) Sumner's ownership of those sixty-six and two-thirds shares. See note 11, *supra*.

record fails to show that at any time before 2004 either child had actual knowledge of Sumner's or Edward's alleged wrongdoing in connection with the 1972 redemption.[29] See *Doe* v. *Harbor Schs., Inc.*, 446 Mass. 245, 254-255 (2006); *Lattuca* v. *Robsham*, 442 Mass. 205, 213 (2004).

Neither Ruth Ann nor Michael (both were minors at the time) was represented in 1972 by a guardian ad litem or independent counsel. See note 29, *supra*. After the redemption took place, however, Ruth Ann and Michael came to be represented by Sumner: when, in 1972, Edward and Sumner "memorialize[d]" the oral trusts in writing, Sumner became sole trustee of the Ruth Ann and Michael Trusts. Sumner served in that role until 1984 for the Ruth Ann Trust, and until 1986 for the Michael Trust. Thus, assuming without deciding the validity of the plaintiffs' theory that Mickey had created oral trusts for Ruth Ann and Michael in 1959, and that Edward had been the trustee of those trusts (before he memorialized the trusts in writing in 1972), Sumner, in 1972, became a successor trustee to Edward.

The defendants do not claim, however, that the statute of limitations began to run during Sumner's tenure as trustee. In any event, Sumner's knowledge that Edward allegedly ended up

---

[29]Although DeGiacomo informed Ruth Ann in 1972 that there had been a "dispute over ownership of the shares," and that some of the shares had been placed in trusts for her and Michael, the record is silent regarding whether Ruth Ann knew of the possibility that she or Michael might have been entitled to additional shares under the theory that oral trusts had been created for their benefit in 1959. In 1972, Ruth Ann and Michael were minors (Ruth Ann was eighteen years old; Michael was fifteen years old), see G. L. c. 201, § 4, St. 1904, c. 163, and neither had a guardian ad litem or independent counsel who could have consented to the 1972 settlement and redemption on their behalf.

Although a guardian ad litem need not be appointed in every matter involving minors, see G. L. c. 201, § 34, here Edward's interests conflicted with those of his children. And while Mickey and Sumner may have "aggressively" promoted the interests of Sumner's and Edward's children (as the defendants claim) insofar as they sought to keep as many shares of NAI in trust for the children as possible, it appears that their motivation may have been to maintain control of NAI in the family, rather than to protect any purported interests of Ruth Ann and Michael. In any event, in order to resolve their dispute with Edward, Mickey and Sumner agreed that Edward owned sixty-six and two-thirds shares (fifty plus the sixteen and two-thirds now disputed by the plaintiffs) presumably because this was in their own interests (and the interests of NAI) and not necessarily because it was in the interests of Ruth Ann and Michael.

owning some of his children's shares did not start the running of the limitations period because Sumner — in furthering his own, Mickey's, and NAI's interests in resolving their dispute with Edward — agreed to the compromise that resulted in Edward's owning sixty-six and two-thirds of the one hundred shares registered in his name. In other words, Sumner, in pursuit of his own interests and those of NAI, agreed in 1972 that thirty-three and one-third shares, rather than fifty, were held in trust for Edward's children. In these circumstances, the statute of limitations did not commence based on Sumner's knowledge of the circumstances underlying the redemption. Cf. *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 522-523 (1997) (in shareholder derivative action for breach of fiduciary duty by corporate directors for usurping corporate opportunities, statute of limitations tolled because, among other things, defendant directors "either benefited from, or acquiesced in, the activities that are the basis of the plaintiff's claims on behalf of the corporations"; court focused on "the impracticality of expecting corporate wrongdoers to bring suits against themselves"; limitations period should not run until disinterested and independent directors are in position to act in corporation's behalf against corporate wrongdoers). Cf. also *Aiello* v. *Aiello*, 447 Mass. 388, 399-407 (2006) (adopting adverse domination doctrine, where statute of limitations in shareholder derivative action tolled if corporate plaintiff under complete domination of wrongdoing directors; action not tolled where one innocent director was able and willing to bring suit on behalf of corporation against three wrongdoing directors).

Sumner was succeeded as trustee by DeGiacomo and Rosen, who became cotrustees of the Ruth Ann and Michael Trusts in 1984 (DeGiacomo served until 1992; Rosen served until 2005). The defendants argue that the statute of limitations for the 1972 redemption was no longer tolled and began to run based on De-Giacomo's position as successor cotrustee of the Ruth Ann and Michael Trusts.[30] There is no question that DeGiacomo, as Edward's attorney in connection with the 1972 settlement agree-

---

[30]The defendants make no argument that the statute of limitations began to run based on Rosen's position as successor cotrustee of the Ruth Ann and Michael Trusts. In any event, Rosen was not deposed in this action (he died in

ment and redemption, had intimate knowledge of Mickey's and Sumner's position at the time that Edward had held fifty shares of NAI for his children under oral trusts created by Mickey in 1959, and not thirty-three and one-third shares as provided in the settlement agreement. DeGiacomo also had intimate knowledge of the terms of the settlement agreement and declarations of trust executed in 1972, which included statements that could be read to suggest that Edward had been holding shares for his children under preexisting oral trusts. Thus, DeGiacomo had the requisite knowledge of potential claims for breaches of fiduciary duty in connection with the 1972 redemption for the statute of limitations ostensibly to have begun to run. Cf. Restatement (Third) of Trusts, *supra* at § 76 comment d; Restatement (Second) of Trusts, *supra* at § 327 & comment 1; G.G. Bogert, Trusts and Trustees, *supra* at § 954, at 675-676.

That DeGiacomo had the requisite knowledge to start the running of the limitations period does not, however, end the matter. DeGiacomo, as Edward's attorney in the 1972 dispute, was Edward's agent, acting on behalf of Edward for purposes of negotiating the settlement. See Restatement (Third) of Agency § 1.01 & comments c, g (2006); Restatement (Third) of the Law Governing Lawyers § 26 & comment b, at 198 (2000) (acts of lawyers "in an important sense . . . really are acts authorized by the principal"). Thus, when asked whether it was Edward's position that no oral trusts existed, DeGiacomo said, "Absolutely," adding, "my position as well, and . . . that's why I brought the suit." In the particular circumstances of this case where DeGiacomo, acting as Edward's agent in 1972, repeatedly asserted that no oral trusts had been established for the grandchildren in 1959, we conclude that, despite DeGiacomo's knowledge of the 1972 transactions, the statute of limitations did not begin to run.[31] Cf. *Demoulas* v. *Demoulas Super Mkts., Inc., supra.* Cf. also *Aiello*

2006), and the record is devoid of any basis on which to determine whether the limitations period began to run because of his role as successor cotrustee. The defendants also make no argument that the statute of limitations began to run based on the knowledge of any interim trustee of the Ruth Ann and Michael Trusts appointed after DeGiacomo resigned in 1992.

[31]We need not resolve whether, as a general rule, in order for the limitations period to be tolled, a successor trustee must participate in the predecessor's alleged wrongdoing as an aider and abetter (as the defendants claim), or

v. *Aiello, supra*; *Samia* v. *Central Oil Co. of Worcester*, 339 Mass. 101, 112-113 (1959).

That the limitations period was tolled when DeGiacomo became a successor trustee in 1984 because of DeGiacomo's role as the agent of Edward (the alleged wrongdoer) in 1972 does not imply that DeGiacomo engaged in any wrongdoing in connection with the 1972 redemption, or in connection with the 1984 redemption. The record before us would warrant a finding that DeGiacomo's actions regarding both redemptions demonstrated good faith. Nor should our ruling on the limitations question be taken as expressing any opinion on the propriety of Edward's actions in 1972. Our sole concern is with the statute of limitations, and on the record before us we conclude that the limitations period was tolled in 1984 with respect to the 1972 redemption.

Accordingly, with respect to the plaintiffs' claims regarding the 1972 redemption, we remand the case for further proceedings. On remand, the only questions will be whether oral trusts were in fact created by Mickey in 1959 for Ruth Ann's and Michael's benefit and, if so, whether they could be revoked or modified; how many shares of NAI were held in the trusts for Ruth Ann and Michael; and who was appointed trustee of the oral trusts and when. See notes 9 & 10, *supra*. Therefore, discovery should be limited to the depositions of Sumner, Edward, and anyone else with personal knowledge bearing on the questions we have outlined, as well as any documentary evidence relevant to resolving those questions. Substantively, the discovery at any such deposition should focus only on those same questions.

If it is established that oral trusts were created in 1959 — a proposition that seems doubtful on the record before us, see note 9, *supra* — then and only then should the issue of damages be considered. On the matter of damages: if it is established that oral trusts were in fact created in 1959, all of the shares under those trusts (including the sixteen and two-thirds shares that Edward allegedly wrongly converted from his two children)

whether a successor trustee must participate in the lesser capacity of merely benefitting from or acquiescing in the predecessor's alleged wrongdoing (as the plaintiffs claim). In this case, the limitations period was tolled because the successor trustee (DeGiacomo) in 1972 was acting as the agent of the alleged wrongdoer, Edward, in connection with the challenged actions, the 1972 settlement and redemption agreements.

would have been redeemed in 1984, because the record in this case shows without dispute that at that time, Ruth Ann and Michael desired that NAI redeem all of their shares. As we explain below, the plaintiffs' claims regarding the 1984 redemption of shares in the Ruth Ann, Michael, and Grandchildren's Trusts are time barred. Therefore, because any shares originally held in oral trusts for Ruth Ann's and Michael's benefit that should not have been "transferred" to Edward in 1972, would have been redeemed in 1984 — consistent with the children's wishes — we conclude that the plaintiffs, assuming the oral trusts are established, would be allowed to receive damages only in the amount of the price per share paid in 1984, together with interest.

c. *1984 redemption.* The plaintiffs claim that, in 1984, Sumner breached his fiduciary duty as cotrustee of the Ruth Ann, Michael, and Grandchildren's Trusts by causing NAI to redeem the shares held in those trusts for inadequate consideration — i.e., that, by concealing from DeGiacomo the true worth of NAI, he improperly caused the shares to be sold to NAI for less than their fair value.[32] After a careful review of all of the facts relevant to the inquiry, we conclude that, in 1984, DeGiacomo (now acting as successor trustee to Sumner) possessed the requisite knowledge to start the running of the statute of limitations, and that the limitations period was not tolled. The plaintiffs' claims arising out of the 1984 transaction are therefore time barred.

When he became cotrustee of the Ruth Ann and Michael Trusts in 1984, DeGiacomo knew of the financial condition of NAI leading up to the time of the redemption. He was aware of the Rosen valuation and the financial information on which it was based (current through NAI's fiscal year 1982), as well as NAI's financial information current as of the date of the redemption, March 8, 1984. In addition, DeGiacomo had knowledge of the value of NAI's real estate through property tax records and Edward's personal knowledge of NAI's real estate, at least. And throughout the redemption process, DeGiacomo obtained expert advice from Citibank representatives regarding the

---

[32]In their complaint, the plaintiffs allege, in conclusory fashion, that Edward "aid[ed] and abett[ed]" Sumner's breaches, but with respect to the 1984 redemption they allege no specific facts supporting their allegation.

value of NAI. That DeGiacomo, during his deposition in 2007, did not specifically recall certain particulars of NAI's financial statements from 1983 and 1984, and that NAI's real estate was not independently appraised for purposes of the redemption, are of no consequence: the record before us establishes that DeGiacomo had sufficient knowledge in 1984 of the financial condition of NAI to put him on notice of any potential claim against Sumner (the predecessor trustee and alleged wrongdoer) regarding the fairness of the price for which NAI redeemed the shares. Accordingly, where DeGiacomo (now the successor trustee) had knowledge of any potential claim against the predecessor trustee, the statute of limitations began to run in 1984, with respect to the redemption of shares in the Ruth Ann and Michael Trusts. Cf. Restatement (Third) of Trusts, *supra* at § 76 comment d; Restatement (Second) of Trusts, *supra* at § 327 & comment l; G.G. Bogert, Trusts and Trustees, *supra* at § 954, at 675-676.

Similarly to the 1972 redemption, DeGiacomo's knowledge is not the only consideration in the unusual circumstances of this case, and we therefore examine his status in relation to the 1984 redemption. In contrast to his role as Edward's attorney in the 1972 redemption, DeGiacomo had no disqualifying agency or other relationship to Sumner (the alleged wrongdoer). The record shows that DeGiacomo never represented Sumner as his counsel and was not paid by Sumner or NAI with regard to the 1984 redemption (the only evidence of DeGiacomo's payment in connection with the 1984 redemption was $27,000 paid from the Grandchildren's Trust). DeGiacomo's role as independent counsel in the redemption process was to make sure the share price was fair to the two trusts' beneficiaries, Ruth Ann and Michael. In that position, he rejected Sumner's accountant's valuation of NAI (the Rosen valuation) and obtained advice from independent experts at Citibank. DeGiacomo negotiated forcefully and persistently with Sumner over several months concerning the value of the shares; in fact, when Sumner became impatient with DeGiacomo and indicated that he could unilaterally terminate the process, DeGiacomo threatened to take Sumner to court over the matter. And through DeGiacomo's persistent negotiation, Sumner, on NAI's behalf, agreed to a redemption price of $15 million for Ruth Ann's and Michael's shares — the top of the range that

DeGiacomo had proposed; $2.5 million more than the top of the range that Sumner had proposed; and $5.1 million more than Rosen had proposed.

In light of those circumstances, we conclude as a matter of law that a potential claim against Sumner by DeGiacomo would not be tolled.[33,34] In other words, we conclude that at the point that DeGiacomo became the successor trustee of the Ruth Ann and Michael Trusts in 1984, the statute of limitations began to run in 1984 with respect to the redemption of shares in the Ruth Ann and Michael Trusts. Cf. Restatement (Third) of Trusts, *supra* at § 76 comment d; Restatement (Second) of Trusts, *supra* at § 327 & comment l; G.G. Bogert, Trusts and Trustees, *supra* at § 954, at 675-676.

Although DeGiacomo was not appointed as a trustee of the Grandchildren's Trust in 1984 (or at any time), for the reasons we describe we conclude that he stood in a fiduciary relationship to all of the beneficiaries of that trust: Ruth Ann, Michael, and Sumner's two children, Brent and Shari. See *Warsofsky* v. *Sherman*, 326 Mass. 290, 292 (1950) ("circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case"). Accord-·ingly, for the same reasons that the limitations period commenced in 1984, with respect to the claims regarding the Ruth Ann and

---

[33]That Sumner was a cotrustee with DeGiacomo of the Michael Trust from 1984 to 1986 is of no consequence: just as a successor trustee has a duty to redress a breach of fiduciary duty by a predecessor trustee, so too does an innocent cotrustee have a duty to redress a breach of fiduciary duty by a wrongdoing cotrustee. See Restatement (Third) of Trusts § 81(2) & comments d & e, and Reporter's Notes (2007); Restatement (Second) of Trusts §§ 184 & 224 (1959). In any event, in 1986 Sumner became a former trustee of the Ruth Ann and Michael Trusts, and DeGiacomo remained trustee until 1992 — i.e., he remained in a position to bring a claim against Sumner, if warranted.

[34]The plaintiffs argue that, in order for the limitations period to have commenced in 1984, the appointment of a guardian ad litem would have been necessary for the minor, unborn, and unascertained trust beneficiaries, because otherwise the limitations period would commence only when those beneficiaries obtained actual knowledge of the alleged breaches. For reasons we have explained, we reject the notion that, in the circumstances presented in this case, actual knowledge of the beneficiaries is necessary to begin the running of the statute of limitations. Accordingly, the plaintiffs' claim regarding the need for a guardian ad litem fails.

Michael Trusts, so too did it commence with respect to the Grandchildren's Trust.[35]

When the redemption took place on March 8, 1984, DeGiacomo was acting as independent counsel for the beneficiaries of the Ruth Ann and Michael Trusts. In that capacity, DeGiacomo assumed the duty to ensure that any sale of shares held in those trusts was in the interest of the beneficiaries of the Ruth Ann and Michael Trusts, and was for a fair price. With respect to the Grandchildren's Trust, DeGiacomo acknowledged that he had a duty to represent the interests of Ruth Ann and Michael vis-à-vis their shares held in the Grandchildren's Trust. And with respect to the other beneficiaries of the Grandchildren's Trust — Brent and Shari — DeGiacomo, although he did not consider himself to be acting as independent counsel for them (the Grandchildren's Trust contained no specific authorization for him to hold that particular title), understood that his determination as to the fairness of the redemption of Ruth Ann and Michael's shares would also apply to Brent and Shari's shares.

Of particular importance, the redemption agreement stated that DeGiacomo "requested that all of the [NAI] shares held by The Grandchildren's Trust be redeemed by [NAI]." The agreement also stated that the trustees of the Grandchildren's Trust concurred in the determination of DeGiacomo, Sumner, and Rosen that "it is in the interest of [Ruth Ann and Michael] as well as the other beneficiaries of The Grandchildren's Trust that the [NAI] shares held by The Grandchildren's Trust be redeemed by [NAI]." In other words, the redemption agreement shows that DeGiacomo was the party who, on behalf of all beneficiaries of the Grandchildren's Trust, instigated the sale of the shares held in that trust to NAI. The agreement also shows that he was one of the parties that determined the sale was in the best interest of all beneficiaries of the Grandchildren's Trust. Moreover, according to the record, the only payment made to DeGiacomo in connection with the 1984 redemption was $27,000 paid by the Grandchildren's Trust.

---

[35]The record contradicts the defendants' argument that the plaintiffs waived their claim regarding the fairness of the price paid for the shares redeemed from the Grandchildren's Trust. For the reasons we explain, however, we conclude that the claim regarding the Grandchildren's Trust is time barred.

In light of these circumstances — especially the fact that, according to the terms of the redemption agreement, DeGiacomo sought ("requested") the sale of property held in the Grandchildren's Trust, after determining such a sale to be in the beneficiaries' interest — we conclude that DeGiacomo was, as a matter of law, a fiduciary of the beneficiaries of the Grandchildren's Trust. Cf. *Doe* v. *Harbor Schs., Inc.*, 446 Mass. 245, 252-253 (2006), citing *Warsofsky* v. *Sherman, supra* (deciding on summary judgment record that fiduciary relationship existed based on nature of parties' interactions, despite denial by fiduciary of existence of fiduciary relationship).

DeGiacomo's knowledge with respect to NAI's financial condition at the time of the 1984 redemption was the same in his role as fiduciary of the Grandchildren's Trust as it was in his role as trustee of the Ruth Ann and Michael Trusts. We therefore conclude that just as the statute of limitations commenced in 1984, with respect to the redemption of the shares in the Ruth Ann and Michael Trusts, it also commenced in 1984, with respect to the redemption of the shares in the Grandchildren's Trust. Accordingly, where the plaintiffs did not commence their action until 2006, their claims regarding the 1984 redemption of shares in all of the trusts are time barred.

3. *Conclusion.* The allowance of the defendants' motion for summary judgment is affirmed in part and vacated in part. The matter is remanded for further proceedings with respect to the claims concerning the 1972 redemption, consistent with this opinion.

*So ordered.*