Forbes Family Ranch Limited Liability Company (Forbes, LLC), a beneficiary of the Hillside Street Trust (HST), commenced this action on August 12, 2011, seeking to have William C. Forbes (Cam)[4] and Julia Forbes (Julia) removed as trustees of the HST pursuant to G. L. c. 203, § 12.[5] After a trial, a judge of the Probate and Family court entered judgment dismissing the complaint and Forbes, LLC, now appeals.[6] ,[7] For the reasons that follow, we affirm the judgment.
Background. We refer the parties to the judge's careful and detailed findings for the background facts which are largely undisputed. We set forth only those facts necessary to address the arguments made on appeal. Briefly, this case revolves around Forbes family trusts which collectively own and/or operate the Beckton Stock Ranch and surrounding properties in Sheridan County, Wyoming. Two Forbes family trusts, the HST and the Beckton Ranch Trust (BRT), own irrigated and nonirrigated foothills on which the ranch operates, as well as acres of open mountain land. A third trust, the Sarah P. Forbes Revocable Trust (the SPFRT), owns the ranch operation. While all three trusts have overlapping beneficiaries and trustees, not all of the beneficiaries and trustees are the same for each trust and the percentages of each trust held by a particular beneficiary also varies.
The HST is a Massachusetts business trust[8] and specifically provides that it is to be governed by Massachusetts law. The purpose of the trust is for the trustees to hold any property acquired by the trust for the benefit of the shareholders. There is no suggestion in the trust instrument that the trustees have any duty to preserve the trust properties in any particular configuration or put them to any particular use. Indeed, when the HST first was created, it held property in Milton, Massachusetts.[9] The trust instrument confers virtually unlimited powers on the trustees to "deal with the trust property for the purpose of carrying out the terms of this trust as if they were the outright owners thereof" with no need to obtain the consent of the shareholders to take action. The HST is to terminate upon the death of Amelia Forbes, 100 years old at the time of trial.[10] The trust provides that "[u]pon termination the entire trust property shall be distributed."[11]
Between 1984 and 1997, Sarah B. Forbes (Sal) transferred all of the shares of the HST to her children including sixty-one shares to each of her living children, Waldo E. Forbes, II (Spike), Charlotte F. Wunderlick (Cherry), Julia Forbes, Sarah Forbes, William C. Forbes (Cam), Edith L. Forbes (Elf), and the remaining fifty-four shares to Douglas and Donald Bingham, the heirs of Sal's deceased daughter. At some point before this litigation, Spike transferred his shares to Forbes, LLC. At the time of the litigation, Cam and Julia were cotrustees of the HST and have been since August of 2007.[12]
The easement transaction. Between 2009 and 2010, the BRT trustees negotiated with the Nature Conservancy regarding the sale of a conservation easement on BRT land. It is undisputed that for many years, the family had been interested in placing a conservation easement on some of the property and there was no opposition to the plan. Ultimately, the Nature Conservancy agreed to pay the BRT approximately $1,684,000 and convey a twenty-four-acre parcel known as the "Polo Field," appraised at $316,000, in exchange for a conservation easement over 1,020 acres of BRT land. The judge found that money in exchange for a conservation easement was both unusual and of great benefit to the BRT. No HST land was included in the conservation easement.[13]
The crux of this appeal turns on the manner in which the BRT granted the easement. In order for funding to be available to the Nature Conservancy from the State of Wyoming, the deal had to be completed by the end of 2010. In October of 2010, BRT learned that the Nature Conservancy would require each shareholder to sign an eligibility form before a sale could be completed. The trustees concluded it simply was not feasible to obtain each BRT shareholder's signature within the required timeframe. The Nature Conservancy, therefore, suggested a single BRT shareholder act as an agent to complete the deal.
The trustees selected Julia to be the agent largely because she lived in a State that did not have personal income tax, time was of the essence, and she was willing to do it. The judge found that the BRT "trustees did not consider a non-trustee as an agent because time was critical and they did not want to jeopardize the transaction." Julia, however, held less than the 210 BRT shares that the trustees determined, based on appraisals and a market analysis, were necessary to exchange for the 1,020 acres on which the conservation easement would be placed. Accordingly, on December 15, 2010, Julia relinquished all sixty-one of her HST shares in exchange for approximately 320 acres of HST land, which bordered both HST and BRT land. She then transferred the 320 acres to the BRT trust for sixty newly issued BRT shares. Next, the BRT transferred the 1,020 acres of BRT land on which the conservation easement was to be placed to Julia in exchange for her 210 BRT shares. Thereafter, on December 15, 2010, Julia granted the conservation easement to the Nature Conservancy over the 1,020 acres.
In early 2011, in exchange for 172 new shares of BRT, Julia conveyed to BRT the 1,020 acres, now burdened by the conservation easement, along with the cash proceeds less taxes and other related transactional expenses.[14] When the transaction was complete, Julia no longer had any shares in the HST. The judge specifically found that Julia did not personally benefit from the easement transaction. In fact, he found that she effectively paid the taxes because she received fewer BRT shares (172) when she transferred the 1,020 acres back into the BRT than the number of shares she used to acquire the 1,020 acres from the BRT (210).
Julia and Cam did not inform the HST shareholders specifically about the trust's acquisition of Julia's shares in advance. However, in a December, 2009, letter to HST shareholders, the trustees had described a mechanism by which shareholders could transfer their shares, represented by a proportionate share of HST property, to the BRT in exchange for shares in the BRT in order to take advantage of the later BRT termination date. The proposal in large part mirrored what occurred with the redemption of Julia's shares in the easement transaction. The trustees invited feedback and indicated that in the absence of objection, they were inclined to offer the "swap" option to the shareholders. None of the shareholders, including Spike, objected. In February of 2011, Julia and Cam provided the shareholders with more specifics on the opportunity to transfer their HST shares for property to be transferred to the BRT for an equal number of BRT shares. So far as the record reflects, none of the shareholders exchanged his or her shares.
The judge found that the trustees chose the specific parcel of HST land transferred to Julia because it did not have access to public utilities or a public road as a stand-alone property and because the water used to irrigate the 320-acre parcel was owned by the BRT. In addition, the judge found that the HST benefited from the sale of the conservation easement to the Nature Conservancy because the HST thereafter held the most prime hunting and recreation land in the area, and the land is the only divisible and buildable land along the face of the mountains that is not burdened by a conservation easement unlike many old working ranches in the area.
Subsequent transactions. After the easement-related transaction, the three Forbes family-related trusts engaged in a complicated series of additional land swaps over a span of many months.[15] The judge found that although there had been a reduction in HST's holdings, following the transactions, the HST held approximately 800 acres of land that can be divided in multiple ways, including three or four small ranches or "ranchettes," two thirty-six-acre subdivided lots, a large tract of mountain land, and the "Fox" property. In short, the judge concluded the HST holdings provided varied possibilities for subdivision to accommodate the shareholders' different interests upon termination of the HST.
Spike commenced this action in the Probate and Family Court seeking removal of the HST trustees, an accounting, and rescission of the trustees' conveyances.[16] He asserted that Cam and Julia breached their fiduciary duties to the shareholders of the HST by participating in "unauthorized" transfers of Julia's shares for trust property. Further, Spike asserted that by virtue of all of the transfers, the HST gave up 573 acres of land, including nearly all of the HST's irrigated lands and lands that support ranch operations and received back a net of approximately forty-five acres of land, the matriarch's house, and four and one-half percent interest in the Fox property, valued at $45,000. Based on expert testimony which he credited, the judge found, however, that when all the transactions had been completed, there certainly had been a loss of acreage and irrigable land, but there had been virtually no loss in value of the HST. Specifically, the judge found that the value of the HST land was $10,850,000 before the transactions and $9,245,000 after the transactions. More importantly, the value of each HST share before the transaction was $25,833.33 and, because the trust recaptured Julia's shares to complete the conservation transaction, the per share value of the HST after the transactions was effectively the same at $25,752.09.
The judge concluded that Cam and Julia did not commit a serious breach of trust or otherwise breach their duties to the shareholders. Further, the judge found that even if they had made errors in judgment, the HST benefited from the trustees' breadth of knowledge and their work as unpaid trustees and it was not in the best interests of the trust to remove Cam and Julia as trustees.
Discussion. We review a decision on whether to remove a "trustee only 'to determine whether the judge's findings are clearly erroneous or whether there has been an abuse of discretion.' " Passero v. Fitzsimmons, 92 Mass. App. Ct. 76, 82 (2017), quoting from Matter of the Trusts Under the Will of Crabtree, 449 Mass. 128, 136 (2007) (Will of Crabtree ). "If challenged, a trustee 'has the burden of showing that he has discharged the duties of trustee with reasonable skill, prudence, and judgment.' " Will of Crabtree, 449 Mass. at 136, quoting from Rugo v. Rugo, 325 Mass. 612, 617 (1950). "[T]he 'question in each case is whether the circumstances are such that allowing the trustee to continue would be detrimental to the trust.' " Will of Crabtree, 449 Mass. at 136, quoting from 2 A.W. Scott & M.L. Ascher, Trusts § 11.10, at 656 (5th ed. 2006).
We limit our review to the issues Spike raises on appeal.
a. Distribution. Spike first argues that the 320 acre transfer to Julia should be considered separately from the subsequent transfers between the trusts and that the judge's conclusion that the transfer of the 320 acres to Julia was not an unauthorized "distribution" pursuant to section five of the HST instrument was clearly erroneous. Quite simply, section four of the trust specifically authorizes the trustees to acquire outstanding shares for such consideration as they may determine is appropriate. Nothing in the terms of the trust prevented the trustees from acquiring Julia's shares. Further, the argument that the transfer was a "distribution" pursuant to section five is contradicted by Spike's own testimony. He testified that Julia "received a defined asset in exchange for consideration, namely her own shares. It was a sale and transfer of assets. It was not a distribution ...." We agree.
As authorized by the trust, the trustees acquired Julia's outstanding shares in exchange for what they considered to be a proportionate share of the trust property. Section five of the trust does allow trustees, in their discretion, to make "distributions" of principal and income to shareholders in proportion to shares held and the trustees at different times did refer to the transfer to Julia as a "distribution." Such statements were made, however, in the context of a "distribution" in exchange for Julia's shares in the HST.[17] Distributions pursuant to section five do not require shareholders to forfeit their shares in the trust. Accordingly, each of Spike's arguments grounded on the premise that the trustees made an unauthorized "distribution," in violation of the terms of the trust, fails.
b. Duty of loyalty. Spike next contends that even if the trust permitted the transfer to Julia, the transfer "violated the fundamental precept of the duty of loyalty that a trustee shall administer the trust solely in the interests of the beneficiaries." Spike largely ignores that the HST instrument grants the trustees extraordinarily broad powers. It even expressly authorizes trustees to have conflicts of interest such as the one alleged here.[18] Where a trust document grants a trustee discretion beyond that ordinarily attaching to a trustee, "acts of a trustee challenged as improper self-dealing will be struck down by the courts only 'upon clear proof that the trustees are abusing their authority and acting in perversion of the trust.' " Steele v. Kelley, 46 Mass. App. Ct. 712, 735 (1999), quoting from Dumaine v. Dumaine, 301 Mass. 214, 221 (1938). That is, courts will interfere with the acts of a trustee granted extraordinary discretion only if the trustee acts "beyond the bounds of a reasonable judgment," "arbitrarily, capriciously," "in bad faith," or "as the result of fraud." Ibid. The record does not support a finding of such egregious conduct in this case. Moreover, Sal knew when she transferred the property into the HST that conflicts of interest were permitted by the terms of the trust.[19] Removal on those grounds, therefore, is not warranted. See Symmons v. O'Keeffe, 419 Mass. 288, 298 n.9 (1995). In addition, as the judge noted, the trust instrument provides that the written approval of an accounting by two-thirds of the shareholders shall completely discharge the trustees and be final and binding upon all shareholders. Here, the judge found that eighty-three percent of the shareholders approved of the trustees' transactions.
That is not to say the trustees' conduct is beyond review. Pursuant to G. L. c. 203E, § 802(g )(3), relied on by Spike, a trustee's duty of loyalty to beneficiaries does not preclude "a transaction between a trust and another trust ... of which the trustee is a fiduciary or in which a beneficiary has an interest," provided the transaction is "fair" to the beneficiaries. Although G. L. c. 203E, § 802(g )(3), is not applicable to this case, earlier case law also recognized that a " 'fundamental fairness' test" applied to assertions that a fiduciary has engaged in self-dealing. Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 529-530 (1997). We conclude that a fairness analysis was appropriate in considering Spike's claim of self-dealing under both versions of the Massachusetts Probate Code.
Based on an appraisal on behalf of the Nature Conservancy, the trustees determined that 320 acres of HST property was the proper consideration for Julia's shares of the HST. That appraisal assigned a value of $3,500 per acre to the property owned by members of the Forbes family, including the HST land. Expert testimony at trial, credited by the judge, reaffirmed that $3,500 per acre was an accurate valuation. Indeed, when Spike later proposed exchanging BRT shares for new HST shares, he agreed that the trustees' "methodology in setting relative land valuations seems fine and appropriate." For reasons explained in his decision and not challenged on appeal, the judge declined to credit Spike's expert's contrary opinion of value of the HST land prior to and after the easement transactions.
The judge found, based on the trustees' expert's testimony which the judge credited, that the HST property was valued at $10,850,000 before the sale of the 320 acres and Julia held 14.52 percent of the HST shares. Thus Julia's interest in the HST had a value of $1,575,420 prior to the redemption of her shares. Multiplying the 320 acres by the $3,500 per acre value adopted by the judge results in a total value of $1,120,000. At that rate, if the transaction was unfair to anyone, it was unfair to Julia.[20] The trustees met their burden to demonstrate that the transaction was fair and we discern no breach of loyalty or other fiduciary duty in the transfer of the 320 acres.[21]
A persistent theme at trial, and reflected in his brief on appeal, was Spike's assertion that the trustees chose the HST's most valuable land to transfer to the BRT. The judge credited the trustees' rationale for choosing the specific 320 acres and concluded the parcel was a logical choice which benefited both trusts by creating more possibilities for subdivision of the HST lands. Moreover, the trust instrument did not require the trustees to preserve any particular land on behalf of the trusts. With the termination of the HST and resulting distribution looming, that the trustees had an eye on reasonable divisions of the land cannot be said to be unreasonable, imprudent, or unfair.
c. Value of HST after all of the transfers between the family trusts. The only argument Spike makes related to the transactions that took place after the easement transaction is that the judge's conclusion that there was no loss in value to the remaining HST shareholders after all of the transactions were completed was clearly erroneous. Spike contends the judge erred in relying on the trustees' expert's appraisal in drawing this conclusion because the expert valued only land and improvements without separately valuing "severable and transferable water rights." The issue of the transfer of Wyoming water rights was precluded by a pretrial motion in limine. Expert testimony on that issue was also precluded. Moreover, it was due to issues regarding water rights that Spike filed a motion to amend his complaint, which was denied. Spike's entire argument on the severable and transferable water rights seems to be an effort to get around these adverse rulings.
To the extent that Spike's contention that the trustees' expert's appraisal testimony should be disregarded because it did not consider severable water rights as a separate component of value was an issue properly raised and preserved below, Spike's contention that water rights should have been assessed separately is not supported by the record. In fact, our review of Spike's expert's appraisal reveals that his expert did not assess water rights as a separate and severable interest. Like the trustees' expert, he reduced the value due to the reduction of irrigated acres, but did not purport to separately value water rights. The trustees' expert noted the amount of irrigable land after the transfers is approximately twenty-two acres, compared to 266 irrigable acres prior to the transfer. Further, the appraisal recognized that irrigable land is more valuable than dry land. In short, the record does not support Spike's supposition that water rights should have been separately assessed or that the trustees' expert appraisal failed to consider and value the loss of "irrigable" acreage.
d. Motion to amend. Finally, Spike argues that the judge erroneously denied his motion to amend, filed on December 10, 2013, six weeks before trial originally was to begin. Although "a trial judge should be generously disposed to amending pleadings," DeVenuti v. Reardon, 37 Mass. App. Ct. 73, 77-78 (1994), "a liberal amendment policy does not justify overriding the rights of a person who would be prejudiced by the last minute allowance of a motion to amend." Walsh v. Chestnut Hill Bank & Trust Co., 414 Mass. 283, 286 (1993). "Among the good reasons ... for which a motion to amend may be denied are that no justification for the lateness of the motion is apparent (beyond counsel for the moving party having had a late dawning idea) and that one or more of the nonmoving parties would be caught off balance by the proffered amendment." DeVenuti v. Reardon, 37 Mass. App. Ct. at 77.
Here, the motion itself reveals that Spike waited some six months from the discovery of facts pertaining to his motion to amend before bringing the motion. Moreover, the defendants argued that the motion could not be allowed because the court lacks jurisdiction over the parties Spike sought to add. On appeal Spike makes no argument that the Probate and Family Court has jurisdiction over the various trustees and family members Spike sought to add. Given the delay in bringing the motion, apparent lack of jurisdiction over defendants sought to be added, and that only one month remained before trial was to begin, there was no abuse of discretion in the judge's denial of the motion to amend.
Judgment affirmed.

Due to the common surname, we use the names and nicknames of the parties used by the parties and the Probate and Family Court.

General Laws c. 203, § 12, was the statute in place governing removal of trustees when this action was commenced in 2011, and the complaint seeks recovery pursuant to it. St. 1954, c. 478, § 3. The subsequent statute, G. L. c. 190B, § 7-308, although approved January 15, 2009, was not made effective until March 31, 2012. St. 2008, c. 521, §§ 9 & 44, as amended by St. 2010, c. 409, § 23, and St. 2011, c. 224. The current statute, G. L. c. 203E, § 706, was made effective July 8, 2012, and specifically provides that it applies only to "judicial proceedings concerning trusts commenced on or after the effective date." St. 2012, c. 140, §§ 56 & 66.
The judge and the parties all cite to the current statute, c. 203E, for the applicable standards on removal. Pursuant to G. L. c. 203E, § 706(b ), "[t]he court may remove a trustee if: (1) the trustee has committed a serious breach of trust; ... (3) because of unfitness, unwillingness or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the interests of the beneficiaries; or (4) there has been a substantial change of circumstances or removal is requested by all of the qualified beneficiaries, the court finds that removal of the trustee best serves the interests of all of the beneficiaries and is not inconsistent with a material purpose of the trust and a suitable co-trustee or successor trustee is available." Under the former G. L. c. 203, § 12, the court could remove a trustee "if it finds that such removal is for the interests of the beneficiaries of the trust or ... [the trustee] is unsuitable therefore." Because the judge's findings are sufficient to sustain his decision under either version of the statute, we conclude the judgment may be sustained.

The complaint also sought to compel a fiduciary accounting but the record suggests that an accounting has been distributed, the judge noted the request for a fiduciary accounting was not before him at trial, and the plaintiff makes no argument on appeal regarding any accounting or lack thereof.

For convenience we refer to the plaintiff, Forbes, LLC, and Spike interchangeably.

A Massachusetts business trust is "a form of business organization ... whereby property is conveyed to trustees, in accordance with the terms of an instrument of trust, to be held and managed for the benefit of such persons as may from time to time be the holders of transferable certificates issued by the trustees showing the share into which the beneficial interest in the property is divided." Brigade Leveraged Capital Structures Fund Ltd. v. PIMCO Income Strategy Fund, 466 Mass. 368, 369 n.4 (2013). See G. L. c. 182, § 1.

Around 1984, Sarah B. Forbes (Sal), widow of Waldo E. Forbes, owned all of the shares of the HST trust and she transferred approximately 3,096 acres of the Wyoming property into the HST in exchange for the Milton property.

Amelia Forbes is the sister of Waldo E. Forbes, and the last surviving child of Ellen Forbes.

Considering Amelia Forbes's advanced years, it was anticipated at all times relevant to this appeal that the termination of the HST was approaching. Indeed, Amelia died on August 31, 2016. The BRT, on the other hand, will terminate twenty years after the death of Amelia Forbes, thus, twenty years after the HST terminates.

Cam manages the ranch and is a trustee of all of the family trusts.

The record is silent as to why no HST land was included. There is no indication that the Nature Conservancy expressed interest in purchasing an easement over HST land and Spike does not contend HST land should have been included.

Julia waited until 2015 to transfer the "Polo Field" to the BRT due to litigation commenced by Spike in Wyoming.

Cam and Julia, as cotrustees of the HST, transferred twenty-eight acres of HST land bordering the property, called Cave Creek, to the SPFRT in exchange for a single acre bordering HST property and a four and one-half percent interest as tenant-in-common in a remote 160-acre parcel of dry grazing land (the Fox property). In addition, BRT transferred to the HST a seventy-two-acre Cave Creek parcel in exchange for 253 acres of HST land referred to as Elk Draw, the site of family graves.

In Wyoming, Spike commenced an action against the trustees of the BRT, making many of the same claims. See Forbes v. Forbes, 341 P.3d 1041 (Wyo. 2015). Although the Supreme Court of Wyoming recognized that the BRT was a Massachusetts business trust, it applied Wyoming law to the issues raised by Spike. As noted earlier, the HST trust contains a provision that it is to be governed by provisions of Massachusetts law. Neither party has argued that Wyoming law should be applied in this case or that principles of res judicata apply to this case. Accordingly, we apply the law of Massachusetts to this dispute.

Spike suggests that the trust's failure to report the exchange on its taxes as a taxable event somehow means it was a "distribution," but does not explain the basis for his argument.

"Any individual acting as a Trustee hereunder ... may deal and contract with, and be employed by the Trustees hereunder ... and may ... be a member, shareholder, creditor, attorney, director, officer, trustee, agent, or employee of any ... trust ... in which the trust hereunder is interested directly or indirectly as a stockholder ... all in the same manner and with the same freedom as though not a Trustee hereunder, and without accountability for any profit, benefit, or compensation received in connection with such action or relationship, notwithstanding, that such action or relationship may require the vote or consent of such individual and/or the Trustees hereunder, and such actions, dealings and transactions shall be neither void nor voidable."

Although Sal was not the original settlor of the HST, she contributed all of the trust's current property to the HST. Presumably, she knew and understood the terms of the trust and the trustees' broad powers.

Admittedly, the Nature Conservancy's appraiser first concluded the original per-acre value was $5,000, but adjusted it downward by thirty percent because of the vast size of the Forbes property and in recognition of the "generally accepted" principle that "significantly larger properties typically sell at per-acre prices less than those similar but smaller properties." Even if we were to conclude that a figure closer to the $5,000 per acre value originally arrived at by the appraiser should apply to the smaller parcel transferred to Julia, the value of the shares at that rate would have been $1,600,000, a close approximation to Julia's interest in the HST.

Because the parties do not make the argument, we do not consider whether to evaluate the trustees' conduct as if they were officers in a closely held corporation. See Richardson v. Clarke, 372 Mass. 859, 861-862 (1977).